IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**FILED IN CLERK'S OFFICE**
U.S.D.C. Atlanta

DEC **2 3** 2016

**JAMES N. HATTEN,** Clerk
By: ⟋ B⟋⟋ **Deputy Clerk**

| | | |
|---|---|---|
| WILLIE PEARL SMITH, | ) | |
| individually and as Personal | ) | |
| Representative for and administratrix | ) | |
| of Akiah Kamil Smith's [Decedent] | ) | |
| ESTATE, | ) | **1:16-CV-4736** |
|    **Plaintiff** "*Pro Se*," | ) | |
| Vs. | ) | Civil Action No._____ |
| Hospital Authority of Cobb County; | ) | **COMPLAINT FOR DAMAGES FOR:** |
| Cobb Hospital, Inc; | ) | |
| WELLSTAR COBB HOSITAL | ) | |
| AUXILIARY, INC; | ) | 1.LACK OF INFORMED CONSENT; |
| WellStar Health System, Inc; | ) | 2.BREACH OF FIDUCIARY DUTY; |
| Wellstar Medical Group, LLC; | ) | 3.ARBITRARY ABUSE; |
| HARRY M. LIGHTFOOT, MD; | ) | 4.FRAUDULENT CONCEALMENT; |
| PRITI PANDYA, MD; | ) | 5.CONSTRUCTIVE FRAUD; |
| ROBERT J. DEL POZO, MD; | ) | 6.BREACH OF PROMISSORY |
| UFUOMA Y. PHILEMON; | ) |   ESTOPPEL |
| PRASHANT PATIL V, MD; | ) | 7.BREACH OF IMPLIED CONTRACT |
| SITAL PATEL V, MD; | ) | 8.CONVERSION |
| RITESH L. PATEL, MD; | ) | 9.FRAUD-FALSIFIED; |
| RIFQUAT GIWA, MD; | ) | 10.WILLFUL MISCONDUCT; |
| GAIL HARRIS, CM; | ) | 11.INTENTIONAL TORT OF |
| JOAN M. CARNAHAN, ARRT; | ) |   WRONGFUL SURGERY |
| JEFFREY S. CHARPENTIER, MD; | ) | 12.NEGLIGENCE; |
| DOUGLAS L. CARR, LD; | ) | 13.MEDICAL BATTERY; |
| AASIM M. SHEIKH, MD; | ) | 14.MEDICAL MALPRACTICE; |
| WALLACE SARA. LD; | ) | 15.WRONGFUL DEATH; |
| FRANK A. BUESE, MD; | ) | 16.PAIN AND SUFFERING. |
| ERIC M. Knauer, MD; | ) | |
| HealthPort Technologies, LLC; | ) | **DEMAND FOR JURY TRIAL** |
| ELEANOR McLOVEEN; and | ) | **REQUEST FOR INJUNCTIVE AND** |
| DOES; | ) | **EQUITABLE RELIEF** |
| **ET. AL.,** | ) | |

-1-

**Defendants.**                                         )

_____ )

Plaintiff Willie Pearl Smith ("PLAINTIFF") proceeding in "*pro se*,[1]" before the

Honorable Court, hereby brings this civil action lawsuit on behalf of deceased

Akiah Kamil Smith ("DECEDENT"). PLAINTIFF is DECEDENT'S mother or one

of the surviving parent[2] or "estate," collectively, and surviving parent brings this

lawsuit for DAMAGES under the GEORGIA WRONGFUL DEATH STATUTE,

---

[1] The federal courts hold allegations of the pro se complaint to less stringent
standards than formal pleadings drafted by lawyers. See e.g., HAINES v.
KERNER, 404 U.S. 519, 520-21; 92 S. Ct. 594; 30 L. Ed. 2d 652 (1972), *followed
by* STACEY v. FORD, 554 F. Supp. 8, 9 (N.D.Ga.1982).

[2] The mother's action properly set forth a cause of action pursuant to the act of
1887 (Georgia). See AUGUSTA R. CO. v. GLOVER, 92 Ga. 132, 143; 18 S.E.
406 (1893). "In all cases hereafter where death shall ensue from or under
circumstances that would entitle the deceased, if death had not ensued, to an action
against the perpetrator of the injury, the legal representative of such deceased shall
be entitled to have and maintain an action at law against the person committing the
act from which the death resulted." WALDEN v. COLEMAN, 217 Ga. 599, 600;
124 S.E.2d 265, 266 (1962). See generally Carringer v. Rodgers, 331 F.3d 844,
847-48 (11th Cir. 2003) (the decedent's mother had standing to assert claims for
her son's wrongful death and funeral expenses under Georgia law; therefore, the
district court erred by dismissing the mother's state law claims); HARDEN v.
UNITED STATES, 485 F. Supp. 380, 392 (S.D.Ga.1980)(assumed federal court
jurisdiction as without dispute, over mother's wrongful death action; applying
Georgia's Tort law; finding government liable for wrongful death; and assessing
damages upon government and adding father as a party to action entitling both
parents to recover award of compensation for statutory damages for the losses
calculated by economist as to the full value of life had decedent lived the normal
life expectancy), *aff'd*, 688 F.2d 1025 (5th Cir. 1982).

O.C.G.A. § 51-4-2[3] and 51-4-5 *et seq.*, which provides that PLAINTIFF may bring

this action on behalf of DECEDENT and may recover the amount of the recovery

for the full value of the life of the decedent: "When death of a human being results

from a crime or from criminal or other negligence, the personal representative of the

deceased person shall be entitled to recover for the funeral, medical, and other

necessary expenses resulting from the injury and death of the deceased person." The

purpose of the WRONGFUL DEATH STATUTE IS ONE THAT IS INTENDED

TO INFLICT PUNISHMENT UPON HOMICIDAL ACTORS OF ALL

SEGMENTS OF SOCEITY WHO BRING ABOUT DEATH OF HUMAN BEING

BY NEGLIGENCE.[4] Plaintiff also has standing to bring this action pursuant to

several other provisions as set forth herein. The claims and questions of this lawsuit,

was initially presented by retention to Morgan & Morgan ("M & M"), Attorneys at

---

[3] The adult decedent's parent does have standing to bring a wrongful death claim
under **O.C.G.A. § 51-4-2**, as an exception to statute in the context of a superior
court exercising its constitutionally granted powers of equity. See Blackmon v.
Tenet Healthsystem Spalding, Inc., 288 Ga. App. 137, 653 S.E.2d 333
(2007), *rev'd on other grounds*, 284 Ga. 369, 667 S.E.2d 348 (2008); Carringer,
*supra.*

  The GIST OF WRONGFUL DEATH ACTION IS NOT INJURY SUFFERED
BY DECEASED, BUT INJURY SUFFERED BY BENEFICIARIES, resulting
from death of the deceased. Lovett v. Garvin, 232 Ga. 747, 208 S.E.2d 838, 839-40
(1974)(upholding statutory construction)

[4] The federal court in Harden, *supra* (*citing* Savannah Electric Co. v. Bell, 124 Ga.
663 at 668, 669, 53 S.E. 109 at 112 (1905) (emphasis added), distinguished
Georgia's punitive statute that appeared in conflict with 28 U.S.C. § 2674
governing liability and authorizing compensation from public officer or entity and
general government, to limit parents recovery.

*3.*

Law, 191 Peachtree Street, NE., Suite 4200, Atlanta, Georgia, for investigation and

pursuit in 2015. However, after more than a year and a half, and after having

obtained production of some medical record from Defendants and from Decedent's

prior health care providers, **see Plaintiff's Exhibit B**, which is a copy of a April 1,

2016 "REQUEST FOR PRODUCTION" by M. Shelli Stephens, RN/Legal Nurse

Consultant for M & M demonstrating that same has been retained, M & M has

elected not to advance the case to a review by a medical doctor. **See Plaintiff's**

**Exhibit C** which is a copy of a April 26, 2016 "CONFIRMATION" by Keenan

R.S. Nix for M & M demonstrating that M & M will not undertake Plaintiff's

representation. As a result, Plaintiff has elected to exercise Smith's Constitutional

right[5] to pursue the causes in this court by means of "pro se." There are no[6] other

proceedings in the state and federal courts. And PLAINTIFF demand[7] a JURY

---

[5] The Georgia Const. of 1983, Art I, § I, ¶ XII provides: No person shall be
deprived of the right to prosecute or defend, either in person or by an attorney, that
person's own cause in any of the courts of this state. **See Georgia Const. of 1983,
Art I, § I, ¶ XII**. This provision comports with the **Judicary Act of 1789, 1 Stat.
73, Ch. XX, § 35** (That in all courts of the United States, the parties may plead and
manage their own causes personally or by assistance of such counsel or attorneys
at law as by the rules of the said courts respectively shall be permitted to manage
and conduct causes therein.).

[6] The Plaintiff has filed a December 24, 2015 claim for beneficiary insurance
payment from Walmart & Prudential Insuance Company of Philadelphia, Pa.
However, these private parties have not promptly paid the claim as decedent had
wanted, when Decedent duly signed Walmart's 2008 associate death benefits
document, making Plaintiff 100% beneficiary.

[7] The Plaintiff request that this Court consider the pleadings under the interest of
justice standard and enter a decision as moved, appointing counsel to represent

TRIAL be conducted by this Court with DEFENDANTS' participation on any

factual dispute arising under the claims as set forth that are not within the justiciable

providence of courts. In support of these allegations, PLAINTIFF, in seeking the

Court's liberal construction of this complaint, demand and requests for relief and in

seeking application of Georgia and Federal law, now assert:

JURISDICTION

1. The jurisdiction of this court is invoked pursuant to **U.S. Const. Art. III, §, Cl.
   1; Amend. 14, § 1[8]; 28 U.S.C. §§ 1331; 1343**.

2. This court also have jurisdiction to effectively enforce the protection of the
   Plaintiff under the circumstances in plaintiff's civil rights, and for plaintiff's
   vindication without offending any other law of the U.S. pursuant to **42 U.S.C. §
   1988(a)**.[9]

---

Plaintiff in this action, because a meaningful examination of Medical experts will
be critical to a finding on the issue of whether medical personnel's failure to timely
consider an anastomotic leak in light of the decedent's past medical surgeries was
unreasonable and fell below the standard of care, and thus, contributed to the death
of decedent. The plaintiff in the meantime will be seeking out an attorney to
undertake representation and speed up the process.

[8] All persons born or naturalized in the United States, and subject to the
jurisdiction thereof, are citizens of the United States and of the State wherein they
reside. No State shall make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States; nor shall any State deprive any
person of life, liberty, or property, without due process of law; nor deny to any
person within its jurisdiction the equal protection of the laws. **See U.S. Const.
Amend. 14, § 1**

[9] The **42 United States Code ("U.S.C.") § 1988(a)** incorporated both Georgia's
wrongful death statute and Georgia's survival statute in order to provide full

3.  This court also has supplemental jurisdiction pursuant to **28 U.S.C. § 1367(a)**
    to determine and try issues arising under **Ga. Const. Art. VI, § IV, Para. I**
    **(2016); O.C.G.A. §§ 15-6-8(1), (6); 15-6-9(6), (8); 51-4-2 and 51-4-5** *et seq*.

VENUE

4.  VENUE is most appropriate in this Court pursuant to **28 U.S.C. § 1391**, as this
    is the Court's judicial district in which a substantial part of the events or
    omissions giving rise to the claims occurred, or a substantial part of property
    that is the subject of the action is situated; and in which the defendants resides,[10]

---

remedies for the violations of the decedent's constitutional rights under **42 U.S.C. §
1983**. Brazier v. Cherry, 293 F.2d 401, 409 (5th Cir. 1961)(binding precedent for
the United States Court of Appeals for the Eleventh Circuit). See RODGERS v.
LANCASTER POLICE & FIRE DEP'T, 819 F.3d 205, 208-09 (5th
Cir.2016)(same). See also Turner v Sullivan, 937 F. Supp. 79, 80
(D.C.Mass.1996)(directing Court clerk to **refer** one count of complaint for medical
malpractice **to county Superior Court** for convening of medical malpractice
tribunal in accordance with state law; holding where suit alleges inadequate
medical treatment as well as deprivations of rights under **42 U.S.C.§ 1983**, and
such allegation involves an allegation of negligence based on state law, which is
the controlling factor, not the circumstances that causes this court to have subject
matter jurisdiction, state-law medical negligence count should follow state-law
procedure enacted to remedy insurance crisis and be tested for legitimacy by
tribunal.); DeNardo v Municipality of Anchorage, 2008 Alas LEXIS 29, *1, 13-14
(Alaska.2008)(**superior court's** award of attorney's fees to municipality was
proper under **42 USCS § 1988**.).

[10] The United States Second Circuit Court of Appeals affirmed a district court
judgment which struck Doctor and Hospital defendants' affirmative defense based
on the limit on recoverable damages under [state law], finding the fact that state
was the situs of the tort and the residence of defendants was not sufficient to
require as a matter of full faith and credit that the limitation in the state law
controlled, in light of the state policy against wrongful death limitations in

6.

maintain their principle place of business and are citizens of the State of Georgia. PLAINTIFF now states:

PARTIES

5. Plaintiff is a 64 year old African-American resident and citizen of Bulloch County, Georgia at 107 Eason Street, Statesboro, Georgia 30458 and is and has been employed as a Health Unit Secretary at East Georgia Regional Medical Center ("EGRMC") of Statesboro, Georgia and at EGRMC's former Bulloch Memorial Hospital for more than fourty (40) years. As set forth in the introductory, Plaintiff is the surviving mother of Decedent and personal representative of Smith's estate. Plaintiff is ignorant of the names and capacities of not only DOES, but also, of the capacities of the named Defendants. Plaintiff will avail under the principles that allow complaints to be freely amended once as a matter of course to allege each Doe and the specific capacities of Doe and named Defendants generally that each are responsible in some manner for the occurrences, injuries, and damages asserted and claimed herein, and that the damages were directly and proximately caused by their acts and omissions, overlapping and acting as the agent of each other and doing thing while acting within the course and scope of their agency and employment. **See Plaintiff's**

_____

connection with its citizens and next of kin and the interstate aspects of the transaction. ROSENTHAL v. WARREN, 475 F.2d 438, 443-46 (2d.Cir.1973)

7.

**Exhibit D** which is a July 25, 2016 "LETTER" by Forrest B. Johnson, Licensed Georgia Attorney, demonstrating that there are legal and material reasons to support a plaintiff's request for discovery in this case. The Plaintiff disputes the Defendants' statements of fact listed in Defendants' Notes, reports and records thus far produced, as inaccurate and misleading toward Plaintiff's rights, privileges and immunities.

6. That the Decedent was a constitutionally healthy or well-developed and well-nourished 24 year-old African-American and single female resident and citizen of Bulloch County, Georgia residing with Plaintiff, and who had recently graduated with a Bachelor's DEGREE from Georgia Southern University, Statesboro, Georgia and had secured full time employment at Georgia Department of Family and Children Services, Screven County, Georgia and was on a visit to see Decedent's sister, Raquel Joyce[11] of 3360 Slate Drive, Austell, Georgia 30106 and was referred and escorted by Joyce and was **involuntarily** admitted on Dec. 8, 2014 by Defendant Hospital on emergency via Ambulance

---

[11] This particular heir of decedent was at all subject times of Decedent's arrival, admission and hospitalization at Defendants' medical business, with general power of attorney from Statesboro Plaintiff to act as decedent's Personal Representative for the purpose of coordinating Plaintiff's efforts with Defendants to have decedent agree, with Plaintiff's concurrence, to be treated in Cobb County for altered mental state that was finally diagnosed for an unspecified type of Encephalopathy. On Mar. 8, 2016, Joyce also has duly executed an AFFIDAVIT OF RELATIONSHIP averring to that effect and is responsible with Plaintiff for the legal affairs for decedent.

8.

for treatment of altered mental state. Decedent evidently believed that cooperation with Hospital at Defendants' place of business **would be to her injury and death** or not to Decedent's best interest, when Decedent put up great resistance or by affirmatively expressing lack of consent by not signing consent forms for medical procedures and privacy matters. Deceased was simply unwilling to correctly answer several basic health questions posed by Defendants Does, Harris, and Buese. Hospital staff acknowledged Decedent's desires not to be treated with a general and major procedure, but refused to honor them, and performed myriad procedures **anyway** and Deceased was admitted the next day as an inpatient. The record is conflicting with respect to whether decedent suffered from any neurological deficiencies on this day. Buese noted that decedent was not in an altered mental state when decedent refused to sign consent forms. Decedent was in no way nearing death for the subsequent and minor abdominal complaint, nor in a persistent vegetative state for the initial and Chief complaint for neurological ailments prior to at least the Dec. 13 & 17, 2014 gastroenterology and total colectomy and other surgeries. If there be a consent from decedent to these twain, it was obtained after decedent was sedated and therefore, lacked capacity to enter an informed consent as to decedent's own body. After such medical care and treatment to Decedent by Defendants Pandya and Lightfoot and etc, had concluded on Dec. 20, 2014

9.

including the afore stated two surgeries on parts of decedent's anatomy that

ironically was not the part that formed such complaint, Decedent did not survive

30 days in the care of a lay person, Joyce, but has died six days thereafter on

Dec. 26, 2014 at Joyce's residence. Competent and credible evidence

establishes that there exist at least one (1) cause of death, such as being from a

fatal medical condition called ACUTE PERITONITIS DUE TO DEHISCENCE

OF SURGICAL ANASTOMOSIS, STATUS POST COLECTOMY. **See**

**Plaintiff's Exhibit A** which is a Mar. 23, 2015 "O.C.G.A. § 9-11-9.1 EXPERT

AFFIDAVIT" as certified under the **Seal** for County of Georgia by Lora

Darrisaw, M.D., M.E., demonstrating that a medical doctor by Dec. 27, 2014

post-mortem,[12] **DID** ascertain that decedent died of **peritonitis** and thus, that

there was a basis for the doctors' opinions that death was caused

by **peritonitis,** which in turn was caused by the December 2014 surgical injury.

---

[12] The Plaintiff states that although this Attestation on the connections to
Defendants' action speaks for itself, same is subject to amendment as the facts of
the case develop; so that in any event, the complaint moves forward to disposition
on its merit as others similarly situated commonly do, because for instance several
*res ipsa loquitur* claims grounded in Plaintiff's medical malpractice claim against
individual Defendants are exempted from the O.C.G.A. § 9-11-9.1 expertise
requirement. Phoebe Putney Mem. Hosp. v. Skipper, 235 Ga. App. 534, 535; 510
S.E.2d 101 (1998) (PROHIBITION AGAINST CURE BY AMENDMENTS DID
NOT PERTAIN WHEN PLAINTIFF FILED PURPORTED AFFIDAVIT, albeit a
defective one, and thus the **exception** to that prohibition was not considered by the
court as an avenue for the plaintiff to escape dismissal of the plaintiff's suit.)

7. That Defendant Hospital Authority of Cobb County ("HACC") is a public corporation activated by a resolution adopted by the Board of Commissioners of Cobb County on August 7, 1962. This Defendant also is public hospital constructed, maintained and operated in Georgia with county funds supplemented by federal aid under the Hill-Burton Act, **42 U.S.C. § 291** *et*

11.

*seq.*,[13] and leases[14] Cobb Hospital, Inc., to Wellstar Health System. HACC

retain ownership of Cobb Hospital, Inc., and Wellstar Cobb Hospital and insure

---

[13] The purpose of this title [**42 USCS §§ 291** et seq.] is-- (a) to assist the several States in the carrying out of their programs for the construction and modernization of such public or other nonprofit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic, or similar services to all their people; (b) to stimulate the development of new or improved types of physical facilities for medical, diagnostic, preventive, treatment, or rehabilitative services; and (c) to promote research, experiments, and demonstrations relating to the effective development and utilization of hospital, clinic, or similar services, facilities, and resources, and to promote the coordination of such research, experiments, and demonstrations and the useful application of their results. **See 42 U.S.C. §§ 291** *et seq*. In this case, Defendant HACC failed to comply with the Act to use federal aid to furnish adequate medical, diagnostic, preventive treatment, or rehabilitative services with respect to deceased while she was alive. See also Corum v Beth Israel Medical Center, (1973, SD NY) 359 F Supp 909, 917 (S.D.N.Y.1973)(Purpose of Hill-Burton Act (**42 USCS § 291**) is not merely to enable hospitals to provide emergency services, but to furnish adequate hospital, clinic, or similar services, which encompass whole range of hospital services); LUGO v. SIMON, 426 F. Supp. 28, 31-32 (N.D. Ohio.1976)(overruling defendant's motion to dismiss and/or for summary judgment on the issues of subject matter jurisdiction and the failure to state a cause of action; because the pleading and motion for summary judgment respecting the regulations promulgated under the Act is a question of law about whether Defendant complied therewith which the judiciary must, in the first instance, resolve.); *Cf.* Rapides General Hospital v Matthews, 435 F Supp 384, 387 (W.D.La.1977)(Implicit in construction of improvements with Hill-Burton funds is notion that improvements would be utilized in rendition of services.)

[14] The acts of a governing body of a public hospital constructed with state and federal funds under the Hill-Burton Act, **42 U.S.C.A. § 291** *et seq.*, are state acts subject to the provisions of U.S. Const. amend. XIV. See SHAW v. HOSPITAL AUTHORITY OF COBB COUNTY, 507 F.2d 625, 627 (5th Cir.1975). Therefore Defendant HACC acts which includes those of its Board and those to whom it lease its authority to and their employees or agents in precluding deceased from her privileges and in denying deceased her equal protection of the laws and in taking her life for deficient medical laws that not only has exacted unprofessional competence and unethical spirit, but also has caused upon deceased inadequate

that WellStar meets the conditions set forth in the leases. HACC's board

members are appointed according to its bylaws. Some authority members are

appointed by county commissioners and some are appointed by HACC itself.

HACC are not subject to taxes, and HACC has no taxing power. However,

HACC's **Previous or Current Tax Exempt Status was Found to be Revoked**

**Found:** November 15, 2013 (Posted date: March 10, 2014[15]). HACC's

registered agent Scott A. Cochran is located at 2950 Atlanta, Rd., S.E., Smyrna,

Ga., 30080

8. That Defendant Cobb Hospital, Inc. ("Chi"), is a general medical hospital in

Austell, Georgia that was organized in 1986 and is on leases to WellStar Health

System, and provide medical services to the citizens of Metro Atlanta and to

Georgia at large, such as to deceased[16] and has its principle place of business

---

medical treatment itself, are state acts subject to the provisions of the Fourteenth
Amendment. See e.g., Sosa v. Board of Managers of Val Verde Memorial Hosp.,
437 F.2d 173, 174 (5th Cir.1971); Foster v. Mobile County Hosp. Bd., 398 F.2d
227, 230 (5th Cir.1968).

[15] The HACC's tax exempt status was revoked for a federal reason (proscribed
maliciousness or bent of mind activities albeit) and remained revoked during all
time period of decedent's connection with those Defendants under its leasing
authority.

[16] The Hospital's Performance Adult Specialties Rankings and Ratings Hospitals
        are evaluated across 16 medical
specialties that include cancer and cardiology & heart surgery. Twelve of the 16
specialties rely heavily on data
from multiple sources like the American Hospital Association and the Centers for
Medicare and Medicaid. In four other specialties, hospitals are scored on reputation
among surveyed physician.

13.

located in Austell, Georgia. Chi is wholly owned by HACC. Chi are not subject
to taxes, and Chi has no taxing power. Chi's registered agent Leo E. Reichert is
located at 793 Sawyer Road, Cobb, Marietta, Ga., 30062.

9. That Defendant Wellstar Cobb Hospital Auxiliary, Inc ("Hospital"), is on lease
from Defendant HACC through Defendant Chi to provide medical treatment to
the citizens of the State of Georgia with its principle place of business located at
3950 Austell Road SW, Austell, Georgia 30106. Hospital was structured as
wholly owned, non-profit subsidiaries of WellStar Health System, Inc.
Hospital's registered agent Leo E. Reichert is located at 793 Sawyer Road,
Cobb, Marietta, Ga., 30062.

10. That Defendant WellStar Health Systems, Inc ("System") is a Not-for-profit
Georgia Corporation described in Internal Revenue Code section 501(c)(3),
providing medical care to the citizens of the State of Georgia with its principle
place of business located at WellStar Health System Administration
Building 805 Sandy Plains Road Marietta, GA 30066 and is wholly owned by
Defendant HACC. System are exempt from federal income taxation as
organizations whose purposes are exclusively charitable, educational, and
scientific as described in Section 501(c)(3) of the Code, and are also exempt
from certain state and local taxes. Systems' registered agent Leo E. Reichert is
located at 793 Sawyer Road, Cobb, Marietta, Ga., 30062.

14.

11. That Defendant Wellstar Medical Group, LLC ("Group") is the Insurance provider for the surgical specialists at Hospital, doing business at 1700 Hospital South Drive, Suite 202, Atlanta, Georgia 30106, which is the location wherein all the medical records of the Defendants are stored. Group's registered agent Leo E. Reichert is located at 793 Sawyer Road, Cobb, Marietta, Ga., 30062.

12. That Defendant Healthport Technologies, LLC, ("Healthport") is the health information management service used by Defendant Group's General Surgical Specialists to access original records and to make certified duplicates under Georgia Evidence Law. Healthport's registered agent CORPORATION SERVICE COMPANY is located at 40 TECHNOLOGY PARKWAY SOUTHSUITE 300, Gwinnett, NORCROSS, GA, 30092.

13. That all remaining defendants ("M.D's" or "employees," collectively) are individuals doing business of known and unknown fashions at the locations of the entity Defendants named above and with the appearance of being certified medical doctors and employees providing medical services in Georgia and at the time of the alleged claims set forth, were all employees/agents[17]/servants of

---

[17] The Defendant Hospital for example is vicariously liable for M.D.s Pozo, Charpentier, Doe Bochar, and DOES, who are employees of Northwest Neurology, PC, 4460 Austell Road, Austell, Georgia 30106, who are on the staff of Hospital, for giving misleading findings and necessarily ineffective medication through evaluations with ineffective instrument e.g., no MRI to Head w/o contrast, none of the brain was part of comparison of CT head w/contrast despite there was found therein a mucus retention of cyst or polyp in the left sphenoid sinus, which is on

top of the fact that On Dec. 19, 2014 at 12:08 p.m., Defendant Pozo paid a visit to Decedent evidently for fraudulent concealment purposes under guise of final legal assessment and status, when he came in the room and noted that decedent was injuring herself with unprescribed zyprexa and Zoloft. However, not only has decedent expressed displeasure with Pozo for the continuous injuries suffered from Pozo and others similarly situated, by not even recognizing him nor speaking to him despite that Buese said that decedent was not altered, and other Defendants M.D.s and RNs, etc, said decedent was altered mentally, and determined that encephalopathy and other neurological disorders that had formed the chief complaint, was connected to the abdomen problems and required surgery, but also, the Cobb County medical examiner found no such drugs in her possession or in the constructive possession of Joyce and nor did examiner find any in her system such drugs formed the injurious causes of death, but has in fact ruled out suicide or foul play.

Further Pozo's putative counterclaim were self-contradictory, frivolous on the merits and are due to be overwhelmed by copious, competent and credible evidence in the record entitling Plaintiff's to recovery in full, as the observation and occurrences established that the surgeries did not work to improve neither the chief nor lesser complaints i.e., Pozo performed a mental examination on decedent that revealed decedent as listless; retarded; congruent with mood; depressed; suffering from word retrieval deficits; having a slowed thought process of paranoid ideation; not aware of the situation, with a mildly impaired judgment and impulse control, and assessed that "clinically she had shown some improvement **before her surgery**" and before she even had zyprexa and Zoloft or was taking same if any, but had deteriorated after the surgery. Ironically, this exam undercut the reliability of Defendant Ritesh L. Patel neurological examination conducted 34 minutes earlier at 11:34 a.m., on dec. 19, 2014, when Patel found decedent's neurological to be "She is alert."

Moreover, Pozo despite of these results has okayed instructions as part of his neurological discharge plan to allow a mentally unstable decedent and the mdd with psychosis as the WDx, whose Lab results keeps remarkably fluctuating up and down as to the vast majority of components, and who is in need of expedited follow up mental treatment, to self-administer the very drugs he accused her of haphazardly taking. Pozo determined that there is no further Chief Complaint, yet he assessed that decedent did not improve after the surgery.

In addition, Pozo noted that there has been a significant increased of current medication administered from two on Dec. 8, 2014, when shortly thereafter those administrations, Buese found decedent resting quietly,talking with her sister, Joyce

16.

same, and were acting in the scope of that employment/agency/servant relationship when they failed to follow the applicable standard of medical care and preventive or rehabilitation services for Georgia during their services to the deceased between Dec. 8, & 26, 2014 at Defendant Hospital and Joyce's residence, which proximately resulted in a physical injury and death to deceased. Plaintiff also states:

## FACTS

The decedent was not treated by a gastroenterologist during all subject time period of the complaint.

A gastroenterologist is a doctor who specializes in digestive diseases (that decedent secondarily suffered from albeit), such as Diagnosing problems in the nerve pathways of the intestinal tissue which requires special techniques in biopsies that are not widely available, but by surgeon generals and nurses.

A surgeon general is a doctor who does not specialize in digestive diseases. As with Registered Nurses, the issue is not close. Doctors Lightfoot and Patel is not listed as of Defendant Hospital's gastroenterologists. Nevertheless, on the same day of inpatient status of Dec. 13, 2014, Patel proceeded to initially perform a colonic decompression without surgically opening the cecum, by colonoscopy. The record

---

and not altered w/blood pressure of 142/96 to twelve (12) with no improvement brain areas forming the originally complaint.

17.

is unclear whether Patel knew that decedent only twenty-six (26) days earlier had undergone a colonoscopy and decompression as performed, by Dr.Muhammad Sherid in the presence and under the supervision and material participation of M.D. Sumantha Daram, and that same made an indefinite recommendation that: no anti-inflammatory or NSAIDs or other Aspirin, Advil, Nuprin be administered. In fact, the pre-colonoscopy reporting of the need for such procedure radically contradict Defendant M.D.s and ironically decedent walked out of the GRMC after that colonoscopy and lived more than the days decedent lived after Defendants' et al., medical treatment. .

The medication in coroner's possession shows that the Hospital's agents Lightfoot and Patel prescribed only Ondansetron, Olanzapine, and Sertraline, which are not what the GRMC doctors prescribed i.e., hypnotic medicine made to work changes in the actions of chemicals in decedent's brain. Two others i.e., Bisacodyl (a laxative that stimulates bowel movements, and is used to treat constipation or to empty the bowels before surgery, colonoscopy, x-rays, or other intestinal medical procedure) and Miralat (is a laxative solution that increases the amount of water in the intestinal tract to stimulate bowel movements, that should not be used if patient is suffering from a bowel obstruction or intestinal blockage and if not, then no more than one time a day) was not traced to a doctor and a pharmacy. **See Exhibit A**, at p. 10. Without the neurologist report there is no conclusion that Defendant Patel

18.

pursuant to improved medical service under the Act, gave out the appropriate prescription of Olanzapine or that decedent was not suffering from a species of dementia, for which Olanzapine cannot be prescribed; and of Sertraline is an antidepressant drug that cannot be taken suddenly whom the medicine community are still unable to fully understand how it works. There was no microscopic examination of the brain to confirm the diagnosis of hypoxic encephalopathy normally associated with infections from total colectomy that human being die from.

The report showed that the blood clot in the legs had reached the lungs causing them to pick up weight overnight and thus, not only did numerous macrophages (any of the large, mononuclear, highly phagocytic cells derived from monocytes, occurring in the walls of blood vessels (adventitial cells) and in loose connective tissue (histiocytes, phagocytic reticular cells). They are components of the reticuloendothelial system. Macrophages have their origin in the bone marrow, where they pass through the monoblast and promonocyte stages to the monocyte stage; the monocytes enter the blood and then the tissues, where they become macrophages. Macrophages are usually immobile but become actively mobile when stimulated by inflammation), showed but also, the alveoli (the tiny air sacs in the lungs through which the exchange of oxygen and carbon dioxide takes place.) had

19.

undergone a phenomenous expansion, so much so that patchy edema or pulmonary fibrosis developed from Pneumonitis that caused decedent's death from hypoxia.

The EGRMC was decedent's primary source of care. The staff at the EGRMC was in the best position other than GRMC with respect to altered mental state, to know the intricacies of his past medical care respecting abdominal issues and to manage any potential related problems that might arise. [Exhibit A (expert opinion that decedent died from an infection developed from the surgery.)]

The medical community list 73 prescription drugs among the course of antibiotic medication available that are well-known to fight the peritonitis and prevent it from spreading. The average medical care professional performing intestinal related surgery on a patient similarly situated to decedent, would or should possess this information and act accordingly. There is not one of these drugs listed in the coroner's report as taken from decedent's sister's residence containing prescription drugs wherein decedent stayed and died in Cobb County, Georgia without foul play being evidenced.

The Defendant doctors and hospital, respectively, has omitted to impart to deceased and plaintiff that a few highly specialized treatment centers offer small intestine transplantation and that they are obliged to recommend small intestine transplantation when all other treatments have failed. **See e.g., Intestinal pseudo-**

2 0.

**obstruction.** *U.S. National Library of Medicine website.* www.ghr.nlm.nih.gov . Updated October 2010. Accessed June 17, 2013.

The decedent's condition posterior to Excision of a segment or of the entire colon or large intestine with the rectum and anus required to be left in place and the end of the small intestine is sew to the rectum or one of the myriad causes of death, was left untreated by antibiotic and did cause blood clots in the legs that traveled to the lungs weighing a combined 790 grams (350 g for right lung and 440 g for left lung), which is far (combined 151 g) above the normal average of 639 (340 g for right lung and 299 g for left lung) for 24 year old females that inturned did cause belly infection and breathing problems which then did cause decedent to suffer from an embolic stroke during decedent's sleep (the untreated or unnursed wounds from the total colectomy caused the stroke is a true or viable theory because the report revealed, **see Exhibit A**, at p. 4, that there was no significant injury to the lungs that could have affected the lungs' weight that ordinarily would rule out respiratory infection albeit), the risk thereof that nothing but the bloodclots in the legs traveled to the lunds and increased decedent's normal female lung weight of 639 grams to that of breathing problem level causing death in sleep state, among others, are well known to medical community, **see e.g., In: Feldman M, Friedman LS, Sleisenger MH, eds.** *Sleisenger & Fordtran's Gastrointestinal and Liver Disease.* 9th ed.

21.

Philadelphia, PA: Elsevier Saunders; 2010:chap 113, was not successfully imparted to decedent and plaintiff by Defendant doctors, respectively.

A hospital's overall Gastroenterology & GI Surgery score is based on various data categories, including volume of high-risk patients, nurse staffing and patient survival. Wellstar's Survival chances in this specialty 30 days after being admitted, adjusted for severity and other risks is 7/10

Wellstar's ability to prevent six types of medical errors across hospital is below average at 1/5.

Wellstar was unrecognized by American Nurses Credentialing Center for high nursing standards as of April 1, 2016. Wellstar was also unrecognized by same as a certified provider of advanced trauma care. Based on opinions of surveyed Medicare inpatients undergoing colon surgery about the overall quality of their stay before and after surgery, Wellstar was rated worst by patients rated Worst.

With respect to Wellstar's Reputation with gastroenterology and GI surgery specialist responding to surveys in 2014, 2015 and 2016 who named hospital as among best for very challenging patients, Wellstar was at 0%. Decedent, Plaintiff and Joyce should have been told this and the decision would have been no and to be released to still live in pain as East Georgia Regional Medical Center and Georgia Regents Medical Center did.

Plaintiff now allege:

## 22.

ALLEGATIONS

14. That the Defendants Pandya, Lightfoot and DOES similarly situated on between
    December 8 through December 20, 2014, performed several surgeries on
    Decedent, at which time thereafter, the surgeries caused decedent to suffer from
    acute **peritonitis,** caused by the escape of barium/hydroxide from decedent's GI
    tract into the abdominal cavity. As a result of the **peritonitis,** decedent
    developed extensive systemic infection and multi-organ failure and **died** on
    Dec. 26, 2014 from complications related to the infection and organ failure.

15. That the Defendants Pandya and Lightfoot and DOES similarly situated was
    **medically negligent** in treating the decedent's abdomen, **wrongfully** causing
    decedent to suffer Acute Peritonitis and Dehiscence therein and thereby
    proximately caused decedent's **death**.

16. That the Defendants Pandya, Lightfoot, Does similarly situated and Hospital did
    breach the appropriate standard of care when discharging Decedent under the
    circumstances of knowing that decedent was suffering from **peritonitis**; that
    Decedent should not have been released but should have been monitored at
    hospital indefinite and/or transferred as an inpatient to the neurology unit as
    recommended; that it is a breach of the standard of care for both the
    anesthesiologists and/or Group, whoever made that decision, to have released
    decedent with her symptoms of difficulty breathing, lung and neurological

problems and the level of continuous abdominal pain decedent was experiencing after the surgeries up to the day of release that was different from the abdominal pain decedent was experiencing after she arrived and was admitted to Hospital (which "was not something that a prudent physician in Pandya's, Lightfoot's and Does' situation should have done" albeit; and that "as a direct and proximate result of decedent's premature discharge, Decedent died."

17. That the Defendants' medical treatments of Dec. 8-26, 2014 connected to decedent occurred in the judicial district of this Court for the United States.

18. That Defendant Pandya performed a Gastroenterology service upon Decedent **without first obtaining consent** from DECEDENT or without first obtaining informed consent from Decedent's joint agent (Plaintiff) and surrogate (Joyce) for terminable decisions about decedent's life.

19. That Pandya was required to obtain informed consent exclusively from decedent and Plaintiff or explain her reasons for not doing so with advise on decedent's rights and responsibilities in all health care decisions and provide them with sufficient time to avail themselves of statutory or public policy relief. Pandya did not. Pandya, thus failed to perform related due care.

24.

20. That all Defendants' employees' statements and gloomy forecast to Plaintiff and decedent regarding decedents health were falsified and inappropriately used to convince them to consent to major surgeries.

21. The risks associated with Pandya's Dec. 13, 2014 colonoscopy and also with aspirating some hemorrhoids while performing colonoscopy were rendered under **non-life saving** circumstances; and "but for" Pandya's intentional tort and/or negligence in failing to more comprehensively define medical terms in layman's terms and in failing to impart more precise disclosures about mortal risks to Plaintiff, the surgeries would not have occurred and necessarily the death by surgically related bacteria morphing into infections or acute peritonitis would not have occurred.

22. That Pandya's surgical techniques during the medical intervention was inadequate and too risky and did lead to decedent's death.

23. That Pandya's failure[18] to comply with the Georgia Informed Consent Statute under the circumstances alleged in Counts above, constituted medical malpractice.

24. That the Defendant Hospital and Group is vicariously liable for Pandya's conduct.

---

[18] The O.C.G.A. § 31-9-6.1 defines the requisite diclosures and thus, requires disclosure of those alternatives that are "generally recognized and accepted by reasonably prudent physicians." See O.C.G.A. § 31-9-6.1.

25.

25. That Defendant Lightfoot **failed to obtain informed consent** from decedent and/or **to adequately inform** Plaintiff and Joyce of the risks[19] associated with the Dec. 17, 2014 **simply useful** total colectomy for their informed consent; and "but for" Lightfoot's and Hospital's M.D.s' deviations from the applicable standard of care i.e., in failing to more comprehensively define medical terms in layman's terms and in failing to impart more precise disclosures about mortal risks, the surgeries would not have occurred and necessarily the death by surgically related bacteria, infections and acute intestinal inflammation would not have occurred.

26. That Lightfoot's surgical techniques during this medical treatment was inadequate. Lightfoot questioned whether he should proceed with total colectomy without neurological consultation for a definitive response that decedent is competent to consent.

---

[19] The information set forth in the facts of this complaint establishes that decedent, who was observed by Defendant Buese as having a healthy Constitution, never stated that decedent is suffering from debilitating pain in the abdomen and thus, had already declined consent for surgical procedures or for Defendants' et al interventions into decedent's life, and makes a viable showing that no reasonable personal representative of decedent, such as Plaintiff here, would have given consent if same had been given comprehensively definitions of all those medical terms of the report and provided with more precise disclosures about the risk of fatalities connected to two or more surgeries of M.D.s coming within one month of several others by non-primary care doctors during hospitalization in GRMC on referral from EGRMC.

27. That the Defendant Hospital and Group is vicariously liable for Lightfoot's conduct.

28. That Defendants HACC, Chi, Hospital and System was **decedent's fiduciary** or was acting in the capacity of manager, administrator, or financial adviser to a federal "plan," within the meaning of the Hill-Burton Act, **42 U.S.C. § 291 *et seq*,** and did breach the managerial obligation to ensure that Defendant Hospital and its M.D.s do not[20] commit the conduct that has adversely affected[21]

---

[20] The HACC does have a quasi-legal duty pursuant to **§ 291 *et seq*.**, which is a regulated field it has decded to enter into with federal and state government, to require Hospital and the M.D.s doing business therein to comprehensively disclose to any healthcare visitor, such as decedent's here, actual medical condition, which includes refraining from taking advantage of vulnerable patients (for spectacular surgical, experimentation and budget related reasons albeit) who refuse to sign off on Hospital and System's nondisclosure policy forms and whom they know showed medical risk factors and refer decedent to the best suited and qualified physician for treatment, which include decedent's primary care physican and others whom had previously operated on decedent. Chi, Hospital and System have similar duties implementing statute, a regulated field which they elected to enter into with HACC and did admit decedent under an adhesive contract after decedent refused to sign on Dec. 8, 2014, and did commit medical battery and medical malpractice upon decedent by subsequent statements, acts including touching, and procedures.

[21] The System's non-profit financial corporation, namely Wellstar Financial, Inc, #0469124 formerly located at 8613 Roswell Road, Suite 205, Atlanta, Ga., 30350, within the VENUE of this Court, has suffered stigma of being administratively closed on at least one occasion under Georgia Executive Law, Title 14, O.C.G.A., and etc. Indeed, myriad LLC formerly functioning as medical or medical and financial related entities to System have been administratively dissolve, notwithstanding that the System hold the second largest market share of any hospital system in Georgia. The conduct strongly suggest that HACC already plagued with related tax problems, and having lost Chi #0X02114 of Marietta, Ga., 30060 to administrative dissolution on Jan. 1, 2001, has not learned their official

27.

decedent's personal and property interest as plan's beneficiary, the action subject to complaint.

29. That after Defendant HACC's construction and operations up to subject time period of complaint, HACC has promulgated invalid by-laws, rules and regulation that do not comply with the Act respecting the services to be rendered in day to day operations of its medical employees or is arbitrarily applied.

30. That the Defendant HACC's such regulation was negligently devised and DID lead the medical doctors to ill-conceive and negligently or arbitrarily decide among themselves that surgeon general without certification as a gastroenterologist could perform procedures and direct appropriate postsurgery medical, treatment, preventive or rehabilitative service, as here, that only a certified gastroenterologist must perform.

---

and quasit-official lessons in entering into lease agreements with Chi and Hospital, when HACC know or should have known that Hospital would routinely deviate from the specially recognized and approved norms, and would benefit and necessarily cause adversities from deficiency in same's corporate status. And there remains somethings e.g., improbity of decisions made on continuing implementation of federal plan, and loss to plan, and etc, to discover just as to whether same overlapped into 2013 revocation issues arising under Georgia Executive Law. See **O.C.G.A. § 31-7-72 et seq.**

28.

31. That Defendant HACC failed to insure that Defendant Hospital, System and Group meets the conditions set forth in the leases, that as a consequences does validated causes of action number one through six and thirteen.

32. That the HACC defendants, hospital and staff members, denied deceased her state created right to have surgical specialist to appropriately practice medicine upon her without regard to deceased theretofore uninsured and indigent status; and any decision to abridge that right by Defendant's by-laws, Rules and Regulations" of the Board and staff of the Hospital was not grounded upon a rational basis designed to further a legitimate state interest.

33. That Defendant Hospital breach the Acts requirement that hospital treat deceased equally to others similarly situated, when same released deceased under insufficiently stabilized conditions after surgery or merely dump deceased in relatives car without providing ambulance service and without any antibotics to prevent infection.

34. That Defendant Hospital infringed its own policy provisions or Patient's Bill of Rights "when Hospital deprived decedent, plaintiff and Joyce the right to full information and counseling on the availability of known financial resources for decedent's health care"; and " when Hospital deprived same the right to expect good management techniques to be implemented within the hospital considering

29.

effective use of the time of the decedent and to avoid the personal discomfort of the decedent".

35. That Defendant Hospital infringed its own policy provisions or Patient's Bill of Rights "when Plaintiff and decedent's Sister Raquel Joyce, who was at all times relevant armed with durable power of attorney from plaintiff over decedent's medical decisions did not receive complete information and an explanation concerning the needs for and alternatives from Hospital respecting available emergency services during post-surgery phase of medical treatment such as ambulance transfer to Joyce's home."

36. The HACC defendant, hospital and staff members, et al, committed inappropriate and neglectful acts upon deceased by arbitrary application of surgery policies that failed to comport with the provisions of the Fourteenth Amendment, as required.

37. The Defendant HACC is liable to Plaintiff for the failure of its hospital and medical staff to provide services upon decedent consistent with the appropriate standard of care for the circumstances encountered.

38. That the Defendant hospital does have a practice which results in the exclusion of any uninsured and indigent person from receiving adequate or improved follow up services at the hospital from a previous hospital, such as when Hospital had requested decedent's medical records from Georgia Regent

30.

Medical Center ("GRMC") and East Georgia Regional Medical Center
("EGRMC") whose conclusions reasoned that decedent had respective stays
therein, for altered mental state and was discharged with various prescribed
medications and was instructed to follow up with visits to neurology; GI;
general surgery clinics and psychiatry, yet when Defendant Lightfoot has
expressed concerned about decedent's mental state and capacity to consent to
the fatal surgery and ordered decedent to care of Hospital's neurologists, no
evidence has been produced to show compliance and results of procedure and
decedent was discharged without any of the previous hospital's prescriptions
being listed as prescribed in its discharge papers according to coroner's report.
[Plaintiff's Exhibit B which is a March 23, 2015 "MEDICAL EXAMINER'S
REPORT" by Lora Darrisaw, M.D & M.E. for Cobb County, Georgia
evidencing that an Autopsy procedure was performed on Decedent on Dec. 27,
2014]

39. That as a result of the Defendant HACC's actions, the federal Plan was deprived
of its effective in Hospital's and M.D.s' treatment of decedent as amounts in
controversy; and "but for" same, Plaintiff would not have suffered this
cognizable loss and of expenses in showing the breach.

40. That Defendant HACC and other persons acting as agent for entities vested with
governmental powers have absolutely **refused to** compromise any claim or to

**produce** any material information generated under Title 31 of the O.C.G.A., even when specifically told that Plaintiff is pursuing protected legal rights as having been infringed in connection with decedent's death.

41. That Defendants Buese, Knauer, Doe, Hospital, System and its employees acting within scope of agency with HACC to implement federal plan, **§ 291 *et seq*,** and other related state plan, and without no conceivable basis other than spite[22] for decedent's refusal to sign forms provided by System and Group, and refusal to work with employees and M.D.s to that effect and for Plaintiff's refusal to give consent for unlimited procedures, did violated decedent's Fourteenth Amendment right to equal protection of the law, by singling out decedent for **arbitrary abuse.**

---

[22] The record shows for instance, that no sooner than on Dec. 8, 2014 when decedent has refused to sign Notice of Privacy Practices form and has refused to sign Consent To Photography w/Notice of Consent To Release of Health Information, that no later than Dec. 17, 2014, Defendant Knauer Photograph, Scan and released a picture to public depicting Defendant Doe as merely **posing** over decedent's whole intestine apparently, and not performing procedure with a sense of urgency. Plaintiff knows as a matter of family relationship, that decedent was an extremely private person and not only did decedent not want this incident to occur during life, as the lack of decedent's consent demonstrate, but also that decedent did not appreciate being asked personal questions by Hospital's employees, both violations of which are unrelated to chief complaint of Joyce that decedent is not acking like her normal self.

42. That Defendants Pandya, Lightfoot, Hospital, System, M.D.s and DOES have
**fraudulently concealed**[23] (a) information as to when they received prior
medical history records; (b) use and/or degree of use of such information; (c)
contribution that such information made to the totality[24] of their medical
determination[s]; (d) the type instruments used to aspirate decedent's veins
during colonoscopy and for other procedures; and (e) information that injury
occurred to decedent due to surgeries, and substituted instead, statements to
Plaintiff, Decedent and Joyce that decedent problems were due to complications
from prior surgeries (and from this and that albeit) that needed to be corrected.

43. That Defendants Group and/or Hospital, System, HACC Healthport actively
conceals or refuses to disclose clinical documentation for reasons for surgeries

---

[23] The Georgia Statute of Fraud has been interpreted generally by the Georgia
Supreme Court to hold that "Because the physician-patient relationship is one of
trust and confidence, Georgia recognizes a duty on the part of the physician to
disclose a negligent act or fact that an injury has occurred. Failure to disclose in
such situations constitutes **fraudulent concealment** which will prevent the
wrongdoer from perpetrating further fraud by using affirmative defenses as a
shield." See e.g., AMERICAN NAT'L BANK v. FIDELITY & DEPOSIT CO.,
131 Ga. 854; 63 S.E. 622, 624-25 (1909). This set of Defendants used the
Defendant System's means to achieve the willful concealment.

[24] The medical notes also indicate concealment of cancer (a term widely circulated
to the general public albeit) in the intestine. If this is true, the revelation of **fraud**
radically alters the claims making for new causes of actions available to Plaintiff as
against not only the named Defendants, but also against a whole set of others
persons wherever their domicile be.

*33.*

without knowing and intelligent consent and nevertheless, plans for post hospital care.

44. The Defendants Pandya, Lightfoot, Groups and others similarly situated nondisclosure of the results of decedent's medical tests and intentionally concealed and withheld critical medical information concerning decedents colonoscopy w/aspirating some hemorrhoids; and open total abdominal colectomy, cholecystectomy, wound vac placement **risk**[25] **factors** causally connected to decedent's acute peritonitis and strokes of several type or pulmonary **risk**[26] **factors** was actual and **constructively fraudulent** and in violations of the Georgia Deceptive Practices-Consumer Protection Act.

---

[25] The medical notes indicate that the surgical removal of hemorrhoids and the previously inserted staples of EGRMC and unknown replacements malfunctioned, resulted in a series corrective surgeries and/or emergencies of general service and hospital medicine that are required to have been done solely through Gastroenterology services, to higher the prevention prospect that additional malfunctions would not occur.

[26] The medical notes indications supports a factual finding that this set of Defendants had actual knowledge of Decedent's peritonitis before discharge because the bacteria that caused the inflammation in the abdomen was present after the second surgery and both Harris and Pozo noted on the day before discharge that decedent was experiencing a dull abdominal ache and that decedent was not clinically improving after the Dec. 13 & 17, 2014 surgeries as she was before same, and failed to do anything meaningful about the symptoms. But rather, as set forth, Pozo took the affirmative act of **fraudulently** concealing the matter in a counter-claim that decedent was haphazardly abusing Zoloft and Zyprexa, and Pozo and others similarly situated with Defendants Pandya, Lightfoot and others similarly situated promised Plaintiff that Joyce's Chief neurological complaint would be largely removed with the removal of decedent's lesser abdominal

45. That Defendant Eleanor in not being present when the matters recorded had occurred and having not interviewed all persons involved in the occurrences and custody of the records, has misrepresented the reliability of the records.

46. That Defendants and their actions referenced in Counts 42-45 above, has unduly thwarted the Plaintiff from uncovering, investigating and pursuing the statutory claims listed herein.

47. The Decedent's election not to consent to such procedures listed in count just above does mean that Defendants Hospital, Group and DOES similarly situated is a breach of **promissory estoppel** rule.

48. That in context as with medical malpractice action against these set of Defendants, their acts in confiscating decedent's living body in the absence of consent implying there is presence of some sort of consenting contract; in willful distortion of the record with a Dec. 19, 2014 Legal Status: Notes by Defendant Pozo, is a **FRAUD** on top of an intentional tort, and in a subsequent cost and insurance visit by Defendant Harris on the same day, nevertheless made a **breach of implied contract** of safe hospitalization and discharge plan, and "putative" **conversion** in violation of Georgia Contract Law. This set of defendants wrote them in the record without performing any diligence or due

---

complaint by surgeries, while Harris did not tell Pandya and Lightfoot and while Wallace did not get the particular Nurse that decedent specifically requested.

3 5.

care into the veracity of decedent's complaint that there is a different abdominal pain being experienced after the Dec. 17, 2014 total colectomy.

49. That damaged arose out of Plaintiff's claims for **fraud** and **constructive fraud, breach of promissory estoppel rule,** and **breach of implied contract** relating to the occurrences that Plaintiff and decedent were prevented from discovering the facts or use of the instrumentality causing the injury such as dumping significant levels of bacteria into decedent's blood stream, within its exclusive management and control of Defendants, that reasonably could have led Plaintiff to prevent myriad internal injuries and the preventable death from occurring to decedent.

50. That the Defendants employees made multiple medication errors that was unnecessary and unsafe, such as saying neurological medicines was abused by decedent, and prescribing same for discharge plan, yet none was found in Joyce's home where decedent died, and there was only two out of the 12 administered on the day of discharge and the record indicates that medical records were routinely **falsified** or egregiously doctored.

51. That the Defendants Healthport, Eleanor and DOES **falsified** hospital record to show that orders regarding decedent's assessments, findings, care and conclusions came from certain physician, when they did not, in violation of the Georgia Fair Business Practices Act (FBPA), **O.C.G.A. § 10-1-390 *et seq*.**

52. That the Defendants Healthport, Eleanor and DOES' falsification did cause Plaintiff to suffer injury and damages, as Defendant's conduct adversely affected the way that Defendants HACC, Hospital, and etc, implemented several federal and state laws for the improvement and integrity of medical practice as required, to decedent, decedent's family and the community at large.

53. That Defendants Philmon, Patil, S. Patel, R. Patel, Shiekh, Pandya and Lightfoot did act out of malice and/or provided improper medical treatment to decedent when the fatal surgery and tools used did dilate decedent's bowel and dehiscence decedent's surgical clips/staples placed there by doctors at EGRMC, so that the intestines spilled out and acutely inflamed the serosa in a necrotizing and widespread fashion or caused an abnormal gastrointestinal system, making the appendix unidentifiable.

54. The DEFENDANT Buese and other employees similarly situated failed to comply with consent policy on Dec. 8 & 9, 2014 by engaging in an active attempt to disqualify Decedent as a competent decision maker about decedent's body. Decedent's lack of consent means that the major surgeries and confluencing of dangerous drugs to correct the injuries therefrom, should have never been performed. These actions amounts to **willful misconduct.**

55. That Defendants Philmon, Patil, S. Patel, R. Patel, and Shiekh, did act out of malice and/or provided improper medical treatment did cause evidence of injury

*37.*

to decedent's legs that contributed to obvious pain and suffering prior to death and contributes to plaintiff's pain and suffering upon being provided with report.

56. The Defendant Buese and other employee's similarly situate actions performing medical "touching" without consent is like any other "touching" without consent: it constitutes the **intentional tort of wrongful surgery** for which this action lie.

57. That the Defendant M.D.s and employees of Hospital negligently failed to give or cause to be given numerous vaccines or antibiotics to decedent needed by same for suffering from colon inertia for potential prevention of infection or acute peritonitis due to dehiscence of surgical anastomosis, post colectomy despite knowing that the Plaintiff had a previous surgery and previous history of possible volvulus with the left sided colectomy and anastomosis several years earlier.

58. That the Defendants M.D.s and employees negligently failed during pre-total colectomy and during colonoscopy in aspirating several veins identified as small hemorrhoids without proscribing the appropriate medication thereto and thereafter, that resulted in blood clots in the legs that passed on to the lungs and possibly the brain, thus causing the decedent to suffer a stroke during sleep and to not awake therefrom.

38.

59. That the Defendants M.D.s and employees negligently failed or misdiagnosed the colon inertia and mismanaged the previously inserted surgical clips/staples, resulting in an unnecessary total colectomy and in the death of decedent a few days later.

60. That the DefendantS Hospital and employees acting before and after discharge, has negligently failed to admit decedents to a proper facility for rehabilitation for total colectomy patients and thus avoided the responsibility to control the antibotics, pain medication order, and any questions by decedent's sister regarding for instance alveoli or lung problems and redness of the leg joints.

61. That DefendantS m.d.S failed to treat decedent's acute abdominal process viewed in light of and considered in the context of decedent's medical history at EGRMC, where there is no antibiotic prescriptions for same [Exhibit B, at p. 10] and no report produced that any such prescription could not be taken with those prescribed by Defendants Lightfoot and Patel.

62. That Defendant Hospital neglected to transfer decedent back to EGRMC for acute abdominal process after completion of any neurological procedure of Nov. 14, 2014, where same was in the best position to follow up such process that began in 2004, and surgery by Hospital was unnecessary under these circumstances, because decedent's intestinal pseudo-obstruction is a generalized disorder that typically affects the entire intestine, and therefore,

*39.*

Removing part of the intestine cannot cure the disease.  As a result, Hospital's decision was medically inappropriate.

63. That Defendant Hospital treatment prior to and post to fatal surgery, was insignificant enough that infection problems or signs and symptoms of peritonitis were anticipated, whereas from medical community experiences from types of surgery decedent received, a significant deterioration in decedent's condition or stability was likely to occur during and within 30 days of decedent's discharge to her sister's residence, which was by private vehicle and in breach of the Anti-Dumping statute, and significant deterioration or an acute peritonitis [A severe and rapid inflammation of the membrane that lines the wall of the abdomen and covers the abdominal organs, that fatally  raised decedent's blood pressure, increased decedent's heart and breathing rate] due to dehiscence of surgical anastomosis,  status post colectomy, did occur.

64. That "[t]he medical treatment provided by Defendants M.D.s and other employees similarly situated as set forth in Counts 56-52 and herein, was **negligence;** as treatment fell below the standard of care within the medical community and proximately caused or proximately contributed to decedent's[27] death."

---

[27] The Plaintiff will act shortly after the filing of this action with this Court, to obtain and file a O.C.G.A. § 9-11-9.1 Expert Affidavit on the claim of medical malpractice and others related as necessary, but not on the claim of intentional tort

40.

65. The Plaintiff's medical evidence show that EACH individual or employee

Defendants are justly and fairly liable to Plaintiff.

66. That Defendants Buese, Pandya, Charpentier, Carnahan, Wallace and other

employees similarly situated injured decedent by the injections medicine and

foods, etc, without consent from decedent to so do. Defendants' such actions

---

and others related, see DeKALB MEDICAL CENTER, INC. v. HAWKINS, 288
Ga. App. 840; 655 S.E.2d 823 (1) (Ga.Ct.App.2007)(finding no error on appeal,
despite of defendant Medical Center's contention that the claim was a medical
malpractice action and that the trial court erred when it failed to dismiss the claim
due to plaintiff's failure to file an expert affidavit, as required by **O.C.G.A. § 9-11-
9.1**, holding that under Georgia law, the decision of whether to continue or
terminate life support for an **incompetent** adult patient belonged exclusively to the
patient's family or legal guardian, not to the hospital, the patient's physicians, or the
State; determining that ultimately, the issue in the case was not whether defendant
violated professional standards of care as in a malpractice case, but whether it
committed an intentional tort when it deliberately terminated the mother's life
support **without any consent from an authoritative source**; ruling that the fact
that expert testimony was needed did not transform the case into one for medical
malpractice), likely from Dr. Atekha Courage, who on or about Nov. 29, 2016
reviewed the medical background of Defendant Lightfoot per request to Plaintiff as
to whether same was a surgeon general or a gastroenterologist, and acknowledging
that the former was applicable to him, and then after undertaking to review the
Medical Examiner's Report, Dr. Atekha stated to Plaintiff, to wit: "Akiah died
from an infection!" I had a sister that died young like that! In addition, one lawyer
from Atlanta, informed Plaintiff, that he was unable to make a reasoned
determination to serve as voice for the plaintiff in this cause, stating that "the lack
of discharge records in those produced thus far, prevents me from opining that
your daughter's evident medical problems that developed post-surgery is the direct
and proximate result of potential defendants' failure under any applicable standard
was unreasonable under the circumstances and in breach thereof, and is more likely
than not either the cause, proximate cause, or contributing cause, to her death."

41.

therefore, fits within the definition of a "procedure" and is a species of

"touching"—a **medical battery**—as to this claim.

67. That the Defendants Pandya, Lightfoot and DOES similarly situated injured

decedent by the surgeries, without consent from decedent to so do. Defendants'

such actions therefore, fits within the definition of a "procedure" and is a

species[28] of physical contact—a **medical malpractice**—as to this claim.

68. That the Defendants M.D.s, Harris, etc, et al., **wrongfully caused the death**[29] of

the decedent by negligent diagnosis, inappropriate medical decisions, aspirating

---

[28] Although the Georgia statutes does not define term "medical malpractice," the federal courts believes that it has a broad definition, because the earlier definition of "medical malpractice" specifically includes a "medical ... prescription ... rendered by a person authorized by law to perform such (a) service." Ga.Code Ann. § 3-1101(a)(3); and that Georgia law historically has allowed medical malpractice suits against physicians and hospitals. St. Joseph's Hospital, Inc. v. Mattair, 239 Ga. 674, 238 S.E.2d 366, 367 (1977) The federal courts generally defer to an interpretation of state law by a federal district judge sitting in that state, provided his interpretation appears to be reasonable and consistent with the state's law. The other jurisdictions have settled case law on the question and also has defined the phrase broadly to encompass "all treatment-related claims." Little v. Rosenthal, 376 Mass. 573, 576, 382 N.E.2d 1037 (1978). Under this interpretation, the statute is not limited to cases alleging that a health care provider's treatment fell below the required standard of care. See e.g., Lubanes v. George, 386 Mass. 320, 325, 435 N.E.2d 1031 (1982); (performing **surgery without consent** is treatment-related and subject to statutory law; Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 517-518, 386 N.E.2d 1268 (1979) (action for breach of contract to produce specific medical result is subject to statutory law.)

[29] The O.C.G.A. § 9-3-70(2) explains that the term action for medical malpractice refers to any claim for damages resulting from the death of or injury to any person arising out of care or service rendered by any public or private hospital, nursing home, clinic, hospital authority, facility, or institution, or by any officer, agent, or employee thereof acting within the scope of his employment.

hemorrhoids, total colectomy, etc, and by co-administration of several contra-

indicated prescriptions drugs under those circumstances.

69. That Defendant Hospital through making myriad medically inappropriate

decisions not in the best interest of decedent including as here, in using the

wrong tools, DID rupture or caused the perforation[30] within the decedent's

abdominal wall leading to decedent's untimely death.

70. The remaining defendant Medical Doctors' diagnosis of deceased and treatment

of the results of the diagnosis is the proximate cause of death because it was

negligent.

71. The remaining defendant Medical Doctors' post-surgery medical treatment is

the proximate cause of death because it was negligent, such as when the first

matter that leaped out of the circumstances of decedent's death at Joyce's

residence, was the Medical Examiner's Investigator, Tempie Hunton

---

[30]The Perforation means:

"a hole or break in the containing walls or membranes of an organ or structure of t
he body."

Perforation occurs when infection, or other factors create a weak spot in the organ
and internal pressure causes a rupture. It also may result from a
deep penetrating wound caused by trauma.

For purposes of the decedent, intestinal perforation or the piercing or rupturing of
decedents alimentary canal allowed the escape of decedent's
digestive tract's contents into the peritoneal cavity as the result of wrong surgical
tool including negligence with respect to preventive treatment and/or misuse of the
right tool, created the condition that inevitably led to peritonitis. **See Mosby's
Medical Dictionary**, 9th edition. © 2009, Elsevier.

questioning of Plaintiff and Joyce just as to "where is the antibiotic?," when
collecting the medical evidence.

72. That decedent in the period between the admission as an inpatient on Dec. 9,
    2014 all the way through and up to decedent's death, experienced conscious
    **pain** and **suffering** from the actions of Defendant M.D.s and other employees
    similarly situates that Plaintiff has complained of herein, damages
    for **pain** and **suffering** experienced by the deceased before his death.

73. That the amount sought in this suit exceeds[31] the jurisdiction limit of the United
    State District Court of Northern Georgia.

74. Plaintiff thus, may recover as a matter of law against the remaining defendant
    medical doctors, as the report and evidence is made to appear as required that

---

[31] The Georgia supreme court found in <u>ATLANTA OCULOPLASTIC SURGERY,
P.C. v. NESTLEHUTT</u>, 286 Ga. 73, 733-740; 691 S.E.2d 218 (2010), that that the
art. I, § I, para. XI(a) constitutional right to a jury trial included the right to a jury
trial for claims involving the negligence of a health care provider, with an
attendant right to an award of the full measure of damages, including noneconomic
damages, as determined by a jury. The court further found that the noneconomic
damages caps in § 51-12-1 unconstitutionally infringed on this right. By requiring
a trial court to reduce a noneconomic damages award determined by a jury that
exceeded the statutory limit, <u>§ 51-13-1</u> nullified the jury's findings of fact
regarding damages, and thus, undermined the jury's basic function. The fact that <u>§
51-13-1</u> permitted full recovery of noneconomic damages up to $ 350,000 was not
relevant because the very existence of the caps, in any amount, violated the right to
trial by jury. Similarly, the existence of punitive damages, statutes authorizing
multiple damage awards, and a trial court's remittitur power did not demonstrate
the constitutionality of the caps. As none of the exceptions to the general rule were
applicable, the court further found that § 51-12-1 was wholly void from the date it
was enacted.

44.

same failed to exercise the required care and skill to prevent decedent's

untimely death.                                    I.

## FIRST CAUSE OF ACTION

(Lack of Informed Consent v. PANDYA and LIGHTFOOT)

73. PLAINTIFF hereby re-alleges and incorporates by reference the allegations

contained in Paragraphs 1 through 27.

74 PANDYA and LIGHTFOOT performed colonoscopy w/aspiration and total

colectomy among others upon DECEDENT without first obtaining informed

consent from DECEDENT or his joint agent and surrogate for health care decisions,

PLAINTIFF.

75. By virtue of the foregoing, including DECEDENT's pre-hospitalization

functioning, clinical improvements prior to the surgeries, and the resources and

support available to decedent, a reasonable person in decedent's position would not

have agreed to major surgeries of the abdomen had he or she been fully informed of

the results and/or risks of, and alternatives to, the same. Likewise, a reasonable

person in PLAINTIFF's position, as joint agent and surrogate for DECEDENT's

health care decisions, would not have agreed to the same had he or she been fully

informed of the material improvements of DECEDENT prior thereto, and the results

and/or risks of, and alternatives to, the same.

45.

76. As a direct and legal result of the foregoing, DECEDENT suffered injuries and death.               II.

## (SECOND CAUSE OF ACTION)

(Breach of Fiduciary Duty v. HACC, CHI, SYSTEM, GROUP, HOSPITAL and HARRIS)

77. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 40.

78. By virtue of their "healthcare provider/patient" relationship, DEFENDANTS had a fiduciary duty to DECEDENT to act with the utmost good faith and in decedent's best interests.

79. DEFENDANTS breached their fiduciary duty to DECEDENT in the ways set forth in paragraph 28-33.

80. By virtue of the foresaid, DEFENDANTS acted recklessly, oppressively, and intentionally in breach of their duties as healthcare providers, despite that Defendants received and continues to receive federal financial assistance for their programs and activities and denied the Plaintiff access to such sources of information and facilities as may be pertinent to ascertain compliance federal Public Health laws regulating their conduct with same, and their implementing regulations. Defendants denial of access to these sources of information and facilities violated § **291 *et seq***, their implementing regulations and Assurances.

46.

81. Defendants signed contractual assurance agreements with the citizens of Georgia and with the United States that all programs and activities receiving federal financial assistance would be conducted in compliance with all of the requirements of Title 42, inter alia, and their implementing regulations, including providing a citizen of standing as Plaintiff, with the right of access to documents, facilities, and other sources of information as may be pertinent to ascertain compliance with same, and their implementing regulations. Defendants' denial of access violates the § 291 *et seq.*, assurances and the assurance of other similar laws of the United States and of the States of Georgia.

82. As a direct and legal result of the foresaid, DECEDENT was injured and died.

83. By virtue of the foresaid, DEFENDANTS acted with deliberate indifference, and punitive and statutory damages should be assessed for that reason.

III.

### THIRD CAUSE OF ACTION

(Arbitrary Abuse v. HACC, CHI, HOSPITAL)

84. PLAINTIFF re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 41.

85. DECEDENT was at all times vulnerable to powerful authorities and corporations within meaning of the Fourteenth Amendment to the United

States Constitution owing to the fact of apparent neurological deficiencies and inability to carry out normal activities or protect rights, and later given the sedative medication and treatment decedent was treated with.

86. At all times herein, each of the DEFENDANTS had care or custody of decdent and upon no consent, would not have been liable to merely refuse inpatient status and treatment, advise rest, and have Plaintiff arrange to return decdent back to GRMC or EGRMC to a medical environment decdent knew and was friendly with for brain treatment, after Buese noted on the day of such status, Dec. 9, 2014, decdent was not in an altered state and was resting comfortably before Dec. 13, 2014 surgery. A failure to act in this manner "would be **arbitrary abuse**."

87. By virtue of the foresaid, DEFENDANTS' employees taking a different route, Defendants vicariously have acted in conscious disregard of the probability of DECEDENT's undesired and unauthorized injury and death, entitling Plaintiff to pre-death pain and suffering damages under state law and PLAINTIFF is entitled to expenses somewhat equivalent to attorneys' fees at this stage under the same provision of law.

IV.

## FOURTH CAUSE OF ACTION

48.

(Fraudulent Concealment v. Pandya and Lightfoot, and etc,

HACC, Chi, Hospital, System, Group, and Healthport.)

88. PLAINTIFF re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 43.

89. DEFENDANTS and each of them had the opportunity and duty to disclose the following facts to DECEDENT by virtue of their relationship with decedent:

a. DEFENDANTS could not obtain the necessary informed consent from the necessary persons for DECEDENT's treatment, and thus were not legally authorized to render any treatment beyond advise to rest at Joyce's home and return to GRMC for follow up mental treatment;

b. The specific terms of the DPOA given to Plaintiff;

c. That as of Dec. 9, 2014, decedent was cleared by Buese as having the ability to prevent any further procedure;

90. None of these facts were disclosed to PLAINTIFF, and they remained concealed from PLAINTIFF until receiving a copy of the records from M & M on approximately April 26, 2016.

91. All DEFENDANTS, and each of them, failed to do so.

92. The failure to make these said disclosures raises legitimate questions that hundreds of hours was spent by these set of Defendant manipulating the facts,

resulting of a business practice by DEFENDANTS established as part of a larger pattern to risk and experiment with vulnerable citizen's lives to receive increased public funding depending on a sussessful outcome.

93. As a result, of these disguises as public policy, Plaintiff were inclined to rely on the assumed good faith of DEFENDANTS, and as a direct and proximate result of said reliance, DECEDENT failed to receive proper care and treatment.

94. As a direct and legal result, DECEDENT suffered injuries and death.

95. By virtue of the foresaid, DEFENDANTS and each of them have acted with fraud and an award of general damages for DECEDENT's pain and suffering under the provisions of state and federal law, and as assessment of punitive damages in a sum demanded, is justified and appropriate.

V.

## FIFTH CAUSE OF ACTION

(Constructive Fraud v. Pandya, Lightfoot, Group)

96. PLAINTIFF re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 46.

97. By virtue of their "healthcare provider/patient relationship" with DECEDENT, DEFENDANTS and each of them owed a duty to DECEDENT and Plaintiff to disclose the extent of the wounds of surgery as legal facts.

97. DEFENDANTS intentionally breached the aforesaid duty requiring federal protection by injunctive relief as is obvious, to check § 291 et seq infringement. Said breaches were motivated by Defendants' interests at stake, and directly and legally resulted in DECEDENT's injury and death.

98. By virtue of the foresaid, DEFENDANTS and each of them have acted with fraud and an award of general damages for DECEDENT's pain and suffering under the federal and state Public Health abd Welfare provisions, and as assessment of punitive damages in a sum claimed by Plaintiff, is justified and appropriate.

## VI.

### SIXTH CAUSE OF ACTION

(Breach of Promissory Estoppel v. Hospital, Group and Etc)

95. PLAINTIFF re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 47.

96. DECEDENT was not a patient of Defendants from Dec. 8, 2014 until being admitted on Dec. 9, 2014. During this period, DECEDENT was under the care of DEFENDANTS who acted as decedent's "primary care physicians," without being admitted.

97. By virtue of being estopped from so acting, Defendants clearly breached the promissory *estoppel* rule; and the breach without affirmative hesitation resulted in decdent's injury and death.

51.

VII.

## SEVENTH CAUSE OF ACTION

(Breach of implied contract v.Hospital, Group, Harris, Pozo, and etc)

98 PLAINTIFF hereby re-alleges and incorporates by reference the allegations

contained in Paragraphs 1 through 48.

99. Like the relationship shown in fiduciary counts, the confiscatory nature of

Defendant's action towards decedent who affirmatively refused to consent made

available federal and state safety protection immediately upon being overruled.

100. By virtue of failure to afford decedent such protection, Defendants became

liable to Plaintiff for statutory and general tort law damages under federal common

law and state law of contracts.

101. As a direct and legal result of the foresaid, DECEDENT was injured and

died; and By virtue of the foresaid, DEFENDANTS acted with deliberate

indifference, and punitive damages should be assessed for that reason.

VIII.

## EIGHTH CAUSE OF ACTION

(CONVERSION v. Hospital, Group, Harris, Pozo)

102. PLAINTIFF hereby re-alleges and incorporates by reference the

allegations contained in Paragraphs 1 through 47.

52.

103. Defendants' attempt to recast purpose of and nature of Decdent's medical problems and Defendant's own lack of success evincing non-compliance with the profession is objectionable meriting injunctive relief and judgment as a matter of law.

104. As a direct and legal result of the foresaid, DECEDENT was injured and died; and By virtue of the foresaid, DEFENDANTS acted with deliberate indifference, and injunctive relief and punitive damages should be assessed for that reason.

### IX.

### NINTH CAUSE OF ACTION

(Fraud - Falsified v. Healthport, Eleanor, DOES and Individual Defendants)

105. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 51

106. These Defendants made myriad acts of fraud and falsified facts that they were employed and entrusted by public official to safeguard in its natural flowings to decedent, Plaintiff, Joyce, M&M, and etc. The attending promises and misdirection was material to PLAINTIFF and material to the appropriate way of handling of DECEDENT's health care decisions and treatment. But the safeguard was relaxed and many matters was left unattended to up to this day

107. As a consequence, no true direction from the communications was ever implemented.

108. As a direct and legal result of the foregoing, DECEDENT was injured and died.

109. By virtue of the foresaid, Defendants acted with fraud and oppression and with recklessness an award of general damages for DECEDENT's pain and suffering under the provisions of Georgia tort law, and as assessment of punitive damages in a sum claimed by Plaintiff, is justified and appropriate.

## X.

## TENTH CAUSE OF ACTION

(Willful Misconduct v. Philimon, Patil, S. Patel, R. Patel, Sheikh, Pandya, Lightfoot and Buese)

110. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 54.

111. During the period of their care of DECEDENT, each of the DEFENDANTS knew or should have known the perils posed to DECEDENT for their failures to comply with their duties of care to provide care which a reasonably prudent hospital operator, administrator, medical doctor, RN, ARRT, CM, or other employee would use.

112. During the period of their care of DECEDENT, each of the

DEFENDANTS knew or should have known that the perils posed by their failure to

comply with their standards of care to provide care which a reasonably prudent

hospital operator, administrator, medical doctor, RN, ARRT, CM, or other

employee would use, exposed DECEDENT to the high probability of decedent's

injuries and death.

113. During the period of their care of DECEDENT, each of the

DEFENDANTS knowingly disregarded the aforesaid perils and high probability of

injury and death to DECEDENT, and in doing so failed to comply with their duties

under the standards of care as set forth above.

**"Wilful misconduct'** on the part of defendants such as these, within the

contemplation of services statutes in Georgia, the doing of an act with *with full*

*knowledge of existing conditions,* the intentional execution of a wrongful course of

conduct which he or she knows should not be carried out or the intentional failure to

do something which he or she knows should be done in connection with his or her

operation of the services, under circumstances tending to disclose that the operator

or employee knows or should know that an injury to his or her patient will be the

probable result of such conduct." Certain of Defendants' willful misconduct and

failures include.

$55.$

a. The DEFENDANTS employees as individuals failed to comply with consent

policy by engaging in an active attempt to disqualify Decedent as a competent

decision maker about decedent's body. Decedent's lack of consent means that the

major surgeries and confluencing of dangerous drugs to correct the injuries

therefrom, should have never been performed.

114. By virtue of the foresaid, DEFENDANTS have acted in conscious

disregard of the probability of DECEDENT's undesired and unauthorized injury and

death, and because DECEDENT was helpless to safeguard except through decedent,

surrogate PLAINTIFF, who did not know what was fully occurring and who had

objected to signing off on full authority of M.D.s' to do as they see fit.

DEFENDANTS' actions and purposes thus, was simply cruel and unjust hardship in

conscious disregard of decedent rights and safety. By virtue of the foresaid,

DEFENDANTS have each acted with recklessness, oppression, and malice, and

their acts and omissions were wrongful. By virtue of the foresaid, punitive damages

should be assessed against DEFENDANTS and each of them, in the sum claim.

## XI.

## **ELEVENTH CAUSE OF ACTION**

(Intentional Wrongful Tort of Surgery v. Buese)

115. PLAINTIFF hereby re-alleges and incorporates by reference the allegations

56.

contained in Paragraphs 1 through 55.

116. Like Willful Misconduct and Fraud and its species, copious, competent and credible knowledge and a callous disregard and an injurious action of the Defendant Buese, carries substantial liability and punishment in our society.

117. By virtue of Defendants action, punitive damages should be assessed against DEFENDANT, in the sum claim, as the facts reveal the sum are more than justified making for a substantial judgment in the State of Georgia.

XII.

## TWELFTH CAUSE OF ACTION

(Negligence v. Defendants et al.,)

118. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 64.

119. Decedent was a patient of Defendants and had a fiduciary relationship with defendant by Dec. 9, 2014. During this period, Decedent was under the care of Defendants who acted as decdent's "primary care agents."

120. By virtue of the foresaid, DEFENDANTS owed a duty of ordinary care to DECEDENT, to use the degree of care and skill that a reasonable prudent person would use. In the case of Defendants M.D.s., and Nurses, to use that degree of care

5 7.

that a reasonably prudent physician would owe given his or her knowledge, training, expertise, and skill.

121. DEFENDANTS breached the aforesaid duties of care.

122. As a direct and legal result of the foresaid, DECEDENT sustained injuries and death. As a further direct and legal result of the foresaid, DECEDENT sustained lost income and other damages in a sum according to proof at trial.

## XIII.

## **THIRTEENTH CAUSE OF ACTION**

(Medical Battery v. Buese, Pandya, Charpentier, Caranahan, Wallace and etc)

123. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 66.

124. Defendants committed medical battery by touching decdent, intravenous administration of sedatives and other prescribed dangerous drugs  and by surgical operations without decedents consent and without the informed consent of Plaintiff and Joyce for health care decisions.

The battery was an unnecessary, unauthorized, and harmful, whose motives requires that Plaintiff be afforded a jury trial to resolve and bring the matter to a close.

125. As a direct and legal result of the foregoing, DECEDENT suffered injuries and death; and by virtue of the foresaid, DEFENDANTS breached Georgia's Battery law, requiring reasonable compensation for pain and suffering to both decedent and to Plaintiff.

XIV.

## FOURTEENTH CAUSE OF ACTION

(Medical Malpractice v. Pandya, Lightfoot, DOES, and etc)

126. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 67.

127. Like medical battery, authorizing recovery for dangerous actions to human life by licensed practitioners, the Defendants fits within the persons that the Georgia law was made to extract recovery for the harm done.

128. By virtues of defendant's action, the extent and limits of recovery requiring a jury trial, actions are subject to Georgia law and federal public health law for full protection of and remedies to Plaintiff.

XV.

## FIFTEENTH CAUSE OF ACTION

(Wrongful Death v. DEFENDANTS ET AL.)

129. PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 71.

130. As a direct and proximate result of the foresaid, DECEDENT died and DECDENT'S surviving parent (PLAINTIFF under GEORGIA WRONGFUL DEATH STATUTE, as alleged above), have been deprived of DECEDENT's love, care, comfort, and society to their general damages according to proof at trial, and according to the sum claimed by Plaintiff.

### XVI.

## SIXTEENTH CAUSE OF ACTION

(Pain and Suffering v. M.D.s et al., Harris and etc)

**131.** PLAINTIFF hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 73.

132. Defendants made decedent suffer from excruciating pain from Dec. 8, 2014 medical battery through medical malpractice ending in death on Dec. 26, 2014, Plaintiff decdent incurred medical, hospital, and funeral expenses

133. By virtue of Plaintiff's election to preserved this distinct cause of action from wrongful death by pleading, Plaintiff succeeds to have same resolved on the merits at trial on the issues.Plaintiff request AWARD for:

## DAMAGES

*Prayer for Relief:*

60.

1. That the Plaintiff loss the "full value of the life of the decedent," through Defendants et al., work medical malpractice and wrongful death upon decedent, including financial value of the decedent's life, lost wages and benefits, what the decedent might reasonably have earned if decedent had lived, and loss of care, companionship, and other intangible benefits the decedent provided to love ones, plus costs.

2. That the Plaintiff suffered from a financial loss related to the decedent's death as estate, including out of pocket funeral and burial expenses of $9,054.45 thousand; medical and travel expenses related to the decedent's last illness or injury endured just before death.

3. That the Plaintiff seek general damages as a judgment of award for pain and suffering endured by Plaintiff as to decedent's last injuries, illness and death, in the amount of $2,500,000.00 million from Defendants, as such the amount of nominal damage may be increased because of the aggravating circumstances alleged to have been involved and is established by the evidence thus far, that same has engaged in the intentional, wanton, or **willful misconduct** and negligence charged to have produced the death of the decedent, as a result of the negligent acts in question, and actual and constructive fraud to conceal same. The full amount of this loss is to be determined at jury trial, plus costs, and for any further relief including

6 1.

expenses to "pro se" Plaintiff somewhat equivalent to amount of fees an attorney may collect under the case's circumstance that this Court determines necessary and appropriate.

4. That alternatively, in the event one or more of the Defendants contend that Decedent died of some cause unrelated to two surgeries, Plaintiff asserts a claim for survival damages pursuant to Georgia law and or pursuant to in an amount to be determined at trial, plus costs, and for any further relief that this Court determines necessary and appropriate, as Plaintiff suffered physical and mental and emotional pain and suffering, loss of enjoyment of decedent's life and medical expenses for care and treatment; as during the period before Decedent died and in conjunction with an alternative survival claim, Plaintiff also asserts a loss of service claim and alleges as a direct and proximate result of the allegations contained in this Complaint, Plaintiff has suffered and will continue to suffer the loss of services, and care and comfort of Decedent's society because of his injuries, disabilities and/or death after surgery, and has incurred expenses for medical treatment rendered to Decedent.

5. That the Plaintiff seek a **$6,956,617.65** million **wrongful death** judgment under the Georgia Wrongful Death Act as special damages resulting from the Defendants' actions, as "Decedent was injured and died therefrom."

62.

6.  That the Plaintiff's evidence shows that Defendants HACC, CHI, Hospital,

System and Group have repeated the same conduct against vulnerable persons

as decedent and Plaintiff, as initiated in the past with similarly situated

decedents and plaintiff, an award of **$250,000.00** thousand in punitive

damages, respectively, should be entered that should punish, penalize, or

deter such Defendants.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury of all issues so tiable

pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102

of the CRA of 1991, and as provided for under the **U.S. Const. Art VII**.

**WHEREFORE**: The PLAINTIFF claims monetary damages and prays for

judgment against DEFENDANTS HAAC, CHI, System, Group, and Healthport for

a total of at least **$9,715,672.10 plus cost and expenses** of filing and litigation. The

PLAINTIFF also claims monetary damages and prays for judgment against

DEFEDANTS Employees as individuals in the **amount to be determined at trial,**

63.

**plus costs and expenses**, and for any further relief that this Court determines

necessary and appropriate.

Respectfully submitted

Dated: December 22, 2016

/s/ Willie Pearl Smith

Willie Pearl Smith, "Pro Se"

Plaintiff

107 Eason Street

Statesboro, Georgia 30458

Phone No. 912.259.2436

64.



# COBB COUNTY
# OFFICE OF THE MEDICAL EXAMINER

150 North Marietta Parkway
Marietta, Georgia 30060
(770) 528-2200 • fax: (770) 528-2207

## PLAINTIFF'S EXHIBIT A          PAGE 1 OF 12

### Medical Examiner's Report

Case Number: _____14C-1399_____

Name of Deceased: __AKIAH SMITH_____

Manner of Death: ___NATURAL_____Date of Death: ____12-26-14_____

Cause of Death: ACUTE PERITONITIS DUE TO DEHISCENCE OF SURGICAL

___ANASTOMOSIS, STATUS POST COLECTOMY_____

Medical Examiner's Investigator: __TEMPIE HUNTON_____

**Procedure:**

Autopsy: _XX___Limited Dissection:_____External Examination:_____

Procedure Date:__12-27-14_____ Day of Week:_____SATURDAY_____

**Certification by Medical Examiner:**

Medical Examiner:_____LORA DARRISAW, M.D., M.E._____

Medical Examiner's Signature:_____ Date: _3/23/2015_

## COBB COUNTY MEDICAL EXAMINER

# -A-    Investigator's Report    PAGE 2 OF 12

Case Number ▓▓▓▓  Juris ▓▓  Supp ▓▓▓▓  Invest ▓▓▓▓▓▓

## Personal Information

| | **First** | **Middle** | **Last** | | |
|---|---|---|---|---|---|
| Name | AKIAH | | SMITH | Address | 3360 SLATE DRIVE |
| | | | | | AUSTELL    GA    30106- |

DOB  01/08/1990  Age Year  24  Month    SSN

Race  B    Sex    F

## Report Information

Dept / Hosp of Reportee  AUSTELL POLICE    Report Date ▓▓▓▓  Report Time ▓▓▓

Reportee    OFC. SEABORNE    Autopsy Dr  DARRISAW

### Pronouncement Information

| Location: | Pronouncer: |
|---|---|
| ON SCENE | HUNTON, TEMPIE, CCME |

Pronounce Date  12/26/2014    DOA ☐
Pronounce Time  21:15    DIC ☐
Admit Date    DEL ☐
Admit Time    DO ☐

### Death Location

3360 SLATE DRIVE

AUSTELL    GA    30106-

### Incident Location

3360 SLATE DRIVE

AUSTELL    GA    30106-

# Incident Investigation

Date of Death ▓▓▓▓    Time of Death ▓▓▓▓    Date of Incident ▓▓▓▓▓

| | | | | | |
|---|---|---|---|---|---|
| DOS ☑ | Decomposed ☐ | Seatbelts ☐ | Note ☐ | Scene ☑ |
| Rigor ☑ | Injuries ☐ | Alcohol ☐ | Charges ☐ | Scene2 ☐ |
| Lividity ☑ | Drug ☐ | Lab Case ☐ | Prisoner ☐ | |

# Incident Description

Officer Seaborne with the Austell Police Department reports the decedent was discovered unresponsive on the floor of her residence by family members when checked upon. The decedent was reportedly recently released from Wellstar Cobb Hospital on December 20, 2014 after undergoing a colon resection and gallbladder removal. The decedent reportedly has a history of multiple previous colon resections related to chronic bowel complications and Hypertension. There were no visible signs of injury and no foul play is suspected in this incident. The Austell Police Department case number is 14120477.



-A-                                    # PAGE 3 OF 12

## INTRODUCTORY REMARKS:

In accordance with the Georgia Death Investigation Act, a complete autopsy is performed on the body identified as AKIAH SMITH at the Cobb County Forensic Science Center. The autopsy is performed by Lora Darrisaw, M.D.

Examination date: Saturday, December 27, 2014
Examination time: 10:50 A.M.

## PRESENTATION OF BODY AND IDENTIFICATION:

As received, the body is lying supine in a white body bag and is identified by the name "Akiah Smith" written on the bag.

Clothing items worn on or received with the body:
1. Multicolored dress
2. Black sports bra

Jewelry:
None

Personal effects:
None

Medications:
Several received

The clothing is released with the body. The medications are inventoried and retained according to office protocol.

## EVIDENCE OF DIAGNOSTIC AND THERAPEUTIC INTERVENTION:

No medical therapeutic devices or marks are on the body.

## IDENTIFYING MARKS AND SCARS:

Tattoos:
None

Scars:
Variable 1 to 5 cm linear scars/stretch marks are on the abdomen, and a maximally 14 cm linear mark is on the lateral torso.

-A-                    **PAGE 4 OF 12**

Page 2
14-1399

## EVIDENCE OF INJURY:

-3 x 0.4 cm red abrasion, anterior right leg
-0.3 cm red abrasion, left knee

## EXTERNAL EXAMINATION:

Race/Gender: Black woman
Weight: ~150 pounds
Height: 66 inches
Recorded age: 24-year-old

## POSTMORTEM FEATURES:

Rigor: Essentially absent
Livor: Left lateral distribution
Decomposition: No decompositional changes

## HEAD AND NECK:

Hair: Black with brown highlights, multiple braids, 26 cm
Eyes: Brown irides, 0.5 cm pupils, congested left sclera and conjunctivae; right clear
Teeth: Natural in good repair
Ear piercing(s): Bilateral earlobes

The head is normocephalic. The nose is normally formed, and the septum is intact and midline.
The oral cavity has moist mucous membranes and is free of injury. The nose and mouth are free
of abnormal fluid or blood accumulation. The ears are normally formed.

The neck is normally formed, free of trauma and supple without palpable adenopathy or masses.
The trachea is palpable in the midline.

## TORSO:

The chest has a normal anterior-posterior diameter and is stable to compression. The breasts are
normally formed, soft and free of palpable masses. The abdomen is mildly protuberant and firm
to palpation. A 21 cm stapled incision is in the midline of the abdomen. There is no appreciable
fluid collection. The back is unremarkable, and the spine appears straight.

## EXTREMITIES:

The upper and lower extremities are normally developed and have a normal number of digits.
The extremities are free of palpable and visible fractures. The fingernails are worn 0.1 cm
beyond the level of the distal fingertips. The feet and toes are unremarkable. The extremities
show no marks or scars that are indicative of intravenous drug usage.

Page 3
14-1399

## EXTERNAL GENITALIA:

The external genitalia are that of a normal adult female. The labia and vaginal vault are free of injuries. No vaginal discharge is noted. The anus and perineum are unremarkable and free of injuries.

## INTERNAL EXAMINATION:

The body is opened with the usual Y-shaped incision. The head is opened with the usual intermastoid incision.

## BODY CAVITIES:

Chest cavity fluid collections: None
Pericardium fluid collection: None
Abdominal cavity fluid collections: ~200 cc tan turbid fluid

The subcutaneous fat and musculature are free of injuries. The sternum and chest plate are intact. The diaphragm is normally formed and shows no defects. The mesentery and serosal surfaces are coated with a pale green-tan fibropurulent exudate. The visceral organs are in the normal anatomic position. The gastrointestinal system has subsequently described abnormalities. No injuries are identified.

## NECK:

The soft tissues, strap muscles and vital structures of the neck are free of injury. The hyoid bone and laryngeal cartilages are intact. The larynx and trachea are opened longitudinally and exhibit intact gray-tan mucosa and no obstruction by foreign objects. The epiglottis is not inflamed or swollen. The cervical spine and atlanto-occipital joint are stable to manipulation.

## CARDIOVASCULAR SYSTEM:

Heart weight: 320 grams
Left ventricle measurement: 1.2 cm

The epicardium is smooth and shiny. The atria and ventricles are normally formed. No septal defects or other congenital abnormalities are seen. The ventricular myocardium is red-brown and has no infarcts either acute or remote. The cardiac valves, papillary muscles and chordae tendineae are normally formed and unremarkable. The coronary ostia arise normally from the sinuses of Valsalva. The great vessels connect to the heart in a normal fashion and have no thrombi. The aortic arch branches arise in the usual fashion.

## RESPIRATORY SYSTEM:

Right lung weight: 350 grams
Left lung weight: 440 grams

Case 1:16-cv-04736-TCB Document 1 Filed 12/23/16 Page 70 of 88

Page 4
14-1399

## RESPIRATORY SYSTEM (continued):

The visceral pleural surfaces are smooth and shiny. The bronchi are unobstructed. The pulmonary vessels are free of thromboemboli. The cut surfaces have no infarcts, masses or palpable consolidation.

## GASTROINTESTINAL SYSTEM:

Stomach contents: 1100 cc green fluid with several small particles

The tongue has no injuries. The esophagus has an intact gray-white mucosa and is unobstructed to the stomach. The stomach is distended; the gastric mucosa is intact and has no masses, erosions or ulcers. The bowel is dilated and the serosal surfaces are dull gray-brown and have adhesions. A segment of the distal bowel has surgical clips/staples that are dehiscent. The bowel wall at this site is markedly thin and has apparent necrosis. Proximally, a site of surgical clips/staples is identified and is intact. The appendix is not identified. The intestines are opened along their length and the mucosa is dark red-brown and poorly preserved. There is no appreciable mechanical torsion. The mucosa has no perforation, masses or ulcers.

The pancreas has a gray-tan lobulated parenchyma and is free of hemorrhage, fibrosis, fat necrosis and masses.

## HEPATOBILIARY SYSTEM:

Liver weight: 1360 grams

The liver has an intact capsule and uniform brown parenchyma. The parenchyma has no focal lesions, nodularity or masses. The surface of the liver has regions coated with purulent exudate. The gallbladder is absent.

## GENITOURINARY SYSTEM:

Right kidney weight: 130 grams
Left kidney weight: 150 grams
Urine: None

The kidney cortical surfaces are unremarkable. The cut surfaces, including the pyramids, calyces, pelves and vessels, are unremarkable. The bladder has a normal mucosa.

## REPRODUCTIVE SYSTEM:

Uterus: The uterus has a normal parenchyma. It is coated with purulent exudate.
Ovaries: Right, present without abnormality; Left, present without abnormality

Page 5
14-1399

## RETICULOENDOTHELIAL SYSTEM:

Spleen weight: 140 grams

The spleen capsule is thin and intact. The cut surfaces have no focal lesions or masses. The lymph nodes of the mediastinal, hilar, abdominal and inguinal areas are unremarkable.

## ENDOCRINE SYSTEM:

The right and left adrenals are of normal size and show no abnormalities. The thyroid gland has a uniform tan-brown parenchyma and is unremarkable.

## MUSCULOSKELETAL SYSTEM:

The axial and appendicular skeleton is unremarkable. The musculature is normally developed and unremarkable.

## NEUROLOGIC SYSTEM:

Brain weight: 1270 grams

The scalp is incised and reflected; no subscalpular or galeal hemorrhages are seen. The calvarium is intact. There are no epidural, subdural or subarachnoid hemorrhages. The surface of the brain shows a normal gyral pattern. The leptomeninges are clear and glistening. The cranial nerves and cerebral arteries are unremarkable. The coronal cut surfaces of the brain are unremarkable. The cut surfaces of the brainstem and cerebellum are unremarkable. The base of the skull is intact.

## POSTMORTEM RADIOLOGY:

Postmortem radiology is not performed.

## MICROSCOPIC EXAMINATION:

Six Hematoxylin and Eosin stained slides are evaluated.

Slide Key:

1 - Lungs
2 – Heart
3 – Heart, liver
4 – Proximal bowel
5 – Distal bowel
6 – Distal bowel (dehiscence)

Page 5
14-1399

## MICROSCOPIC EXAMINATION (continued):

The following findings are observed:

Lungs:
The alveoli are variably expanded and display patchy edema and numerous macrophages. No acute infectious process is identified.

Heart:
The myocardium is free of inflammation and fibrosis. The myocytes are unremarkable.

Liver:
The hepatocytes display occasional mild steatosis. The portal spaces are free of inflammation and fibrosis. The capsule has regional acute inflammatory exudate.

Gastrointestinal tissue:
The serosa has widespread necrotizing acute inflammation. At the site of dehiscence, there is exuberant fibrous reactive proliferation and granulation tissue. The bowel mucosa has no neoplastic, traumatic, inflammatory or anatomic abnormalities.

## OTHER PROCEDURES:

1. Blood collected in purple top tube held for serology.
2. Specimens collected for toxicology: Iliac blood and liver
3. Identification and documentation photographs taken.
4. Tissue sections (6) submitted for histology.
5. Evidence collected: Fingerprints
6. Materials/records reviewed: WellStar Cobb Hospital

## SUMMARY OF FINDINGS/PATHOLOGIC DIAGNOSES:

I.     Acute peritonitis with purulent exudate and 200 cc peritoneal feculent material

II.·   Status post recent colon resection, dehiscence of distal surgical anastomosis

III.   No appreciable neuropathologic abnormalities

## OPINION/SUMMARY:

This 24-year-old black woman, Akiah Smith, was reportedly found unresponsive on the floor at her residence. She has a history of recent colon resection following apparent colonic dysmotility; she was released from the hospital on 12/20/2014. The autopsy discloses significant findings related to the gastrointestinal system and no additional organ system abnormalities. There is acute peritonitis resulting from dehiscence of a site of apparent surgical anastomosis, and the regional bowel wall is markedly thin and necrotic.

## -A- PAGE 9 OF 12

Page 7
14-1399

### CAUSE OF DEATH:

Acute peritonitis
Due to: Dehiscence of surgical anastomosis, status post colectomy

### MANNER OF DEATH:

Natural

_____

**LORA DARRISAW, M.D., M.E.**

3/23/2015
**DATE**

**OFFICE OF THE MEDICAL EXAMINER**
**COBB COUNTY, GEORGIA**

**PRESCRIPTION INVENTORY**
CASE NUMBER: _14G-1399_

INVESTIGATOR: _Hunton_
INVENTORIED BY: _E Bailey_

| Drug | Strength | Doctor | Pharmacy | Phone # | RX Number | Date Filled | # Issued / Present | Dosage Rate | Pill ID |
|---|---|---|---|---|---|---|---|---|---|
| Amlodipine Besylate | 2.5mg | Atekha Courage | Walgreens | 912 489-3008 | 0834428 09257 | 10/4/14 | 30 / 4 | take 1 once daily | White, Four-sided LU HII |
| Oxycodone / Acetamidophen | 5-325mg | Aasim Sheikh | Walgreens | 678 945-1640 | 0688371 07377 | 12/20/14 | 40 / 28 | take 1 every 4 hrs as needed for pain | Round white A349 |
| Metoprolol Tartrate | 25mg | Aasim Sheikh | Walgreens | 678 945-1640 | 0688370 07377 | 12/20/14 | 60 / 59 | take 1/2 2x daily | Round white m 18 |
| Ondansetron | 4mg | Harry Lightfoot Jr | Walgreens | 678- 945-1640 | 0689951 07337 | 12/24/14 | 13/60 / 11 | take 1 every 8 hrs as needed for nausea | Elliptical white G1 4 |
| Olanzapine | 5mg | Ravish Patel | Walgreens | 678 945-1640 | 0689019 07337 | 12/20/14 | 30 / 30 | take 1 everyday | Round off white Teva 5768 |
| Sertraline | 50mg | Ravish Patel | Walgreens | 678 945-1640 | 0689020 07777 | 12/20/14 | 30 / 30 | take 1 every morning before breakfast | Oval blue G4900 50mg |
| Bisacodyl | 5mg | — | — | — | — | — | 25 / 25 | — | Round orange 5 |
| MiraLax | | — | — | — | — | — | 10 pm /10 daily | | |
| | | | | | | | / | | |
| | | | | | | | / | | |
| | | | | | | | / | | |
| | | | | | | | / | | |
| | | | | | | | / | | |
| | | | | | | | / | | |
| | | | | | | | / | | |

DISPOSITION OF DRUGS: (DESTROYED) / SUBMITTED

DATE DESTROYED OR SUBMITTED: _4-24-15_  WITNESSED BY: _C_  WITNESSED BY: _EB_  PAGE _1_ of _1_

-A-

PAGE 10 OF 12

Case 1:16-cv-04736-TCB Document 1 Filed 12/23/16 Page 75 of 88

## GEORGIA DEATH CERTIFICATE

State File Number 2014GA000778xx

| 1. DECEDENT'S LEGAL FULL NAME (First, Middle, Last) | 1a. IF FEMALE, ENTER LAST NAME AT BIRTH | 2. SEX | 3a. DATE OF DEATH (Mo., Day, Year) |
|---|---|---|---|
| AYIAN KABIL SMITH | SMITH | FEMALE | ACTUAL DATE OF DEATH 12/29/2014 |

| 4. SOCIAL SECURITY NUMBER | 5a. AGE (Years) | 5b. UNDER 1 YEAR | 5c. UNDER 1 DAY | 6. DATE OF BIRTH (Mo., Day, Year) |
|---|---|---|---|---|
| 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 | 24 | Mos. Days | Hrs. Min. | 01/04/1990 |

| 6. BIRTHPLACE | 7a. RESIDENCE - STATE | 7b. COUNTY | 7c. CITY, TOWN |
|---|---|---|---|
| GEORGIA | GEORGIA | BULLOCH | STATESBORO |

| 7d. STREET AND NUMBER | 7e. ZIP CODE | 7f. INSIDE CITY LIMITS | 8. ARMED FORCES |
|---|---|---|---|
| 147 EASON STREET | 30464 | YES | NO |

| 9a. USUAL OCCUPATION | 9b. KIND OF INDUSTRY OR BUSINESS |
|---|---|
| CASE MANAGER | SOCIAL WORK |

| 9. MARITAL STATUS | 10. SPOUSE NAME | 11. FATHER'S FULL NAME (First, Middle, Last) |
|---|---|---|
| NEVER MARRIED | | CHARLES BROWN |

| 12. MOTHER'S MAIDEN NAME (First, Middle, Last) | 13a. INFORMANT'S NAME (First, Middle, Last) | 13b. RELATIONSHIP TO DECEDENT |
|---|---|---|
| WILLIE PEARL SMITH | WILLIE PEARL SMITH | MOTHER |

| 13c. MAILING ADDRESS | 14. DECEDENT'S EDUCATION |
|---|---|
| 147 EASON STREET STATESBORO GEORGIA 30458 | BACHELOR'S DEGREE |

| 15. ORIGIN OF DECEDENT (Hispanic, etc.) | 16. DECEDENT'S RACE (White, Black, etc.) |
|---|---|
| NO, NOT SPANISH/HISPANIC/LATINO | BLACK OR AFRICAN-AMERICAN |

| 17a. IF DEATH OCCURRED IN HOSPITAL | 17b. IF DEATH OCCURRED OTHER THAN HOSPITAL (Specify) |
|---|---|
| | DECEDENT'S HOME |

| 18. HOSPITAL OR OTHER INSTITUTION NAME (If not in hospital give street and No.) | 19. CITY, TOWN OF LOCATION OF DEATH | 20. COUNTY OF DEATH |
|---|---|---|
| 3300 BLATE DRIVE | AUSTELL | COBB |

| 21. METHOD OF DISPOSITION (Specify) | 22. PLACE OF DISPOSITION | 23. DISPOSITION DATE (Mo., Day, Year) |
|---|---|---|
| BURIAL | BULLOCH MEMORIAL GARDENS, 1172 22656 US HWY 80 EAST STATESBORO GEORGIA 30458 | 01/04/2014 |

| 24a. EMBALMER'S NAME | 24b. EMBALMER LICENSE NO. | 25. FUNERAL HOME NAME |
|---|---|---|
| WALTER SAMUELS | 2296- | HILLS MORTUARY INC |

| 26a. FUNERAL HOME ADDRESS |
|---|
| 95 PARKING HOUSE ROAD STATESBORO GEORGIA 30458 |

| 26b. SIGNATURE OF FUNERAL DIRECTOR | 26c. FUN. DIR. LICENSE NO. | AMENDMENTS |
|---|---|---|
| WALTER SAMUELS | 2296 | |

| 27. DATE PRONOUNCED DEAD (Mo., Day, Year) | 28. HOUR PRONOUNCED DEAD |
|---|---|
| 12/29/2014 | 21:14 MILITARY |

| 29a. PRONOUNCING NAME | 29b. LICENSE NUMBER | 29c. DATE SIGNED |
|---|---|---|
| TEDDIE HUNTER | | 12/24/2014 |

| 30a. TIME OF DEATH | 31. WAS CASE REFERRED TO MEDICAL EXAMINER |
|---|---|
| 21:12 MILITARY | YES |

| 32. Part I. Enter the chain of events—diseases, injuries, or complications that directly caused the death. DO NOT enter terminal events such as cardiac or respiratory arrest, shock, or heart failure. | Approximate interval between onset and death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) A. ACUTE PERITONITIS | UNKNOWN |
| Due to, or as a consequence of: B. DEHISCENCE OF SURGICAL ANASTOMOSIS, STATUS POST COLECTOMY | UNKNOWN |
| Due to, or as a consequence of: C. | |
| Due to, or as a consequence of: D. | |

| Part II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I Or. | 33. WAS AUTOPSY PERFORMED? | 34. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|
| | YES | YES |

| 35. TOBACCO USE CONTRIBUTED TO DEATH | 36. IF FEMALE (age 10-54) PREGNANT | 37. ACCIDENT, SUICIDE, HOMICIDE, UND ETERMINED (Specify) |
|---|---|---|
| NO | UNKNOWN IF PREGNANT WITHIN THE PAST YEAR | NATURAL |

| 38. DATE OF INJURY (Mo., Day, Year) | 39. TIME OF INJURY | 40. PLACE OF INJURY (Home, farm, Street, Factory, Office, Etc.) (Specify) | 41. INJURY AT WORK? (Yes or No) |
|---|---|---|---|
| | | | |

| 42. LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) |
|---|
| |

| 43. DESCRIBE HOW INJURY OCCURRED | 44. IF TRANSPORTATION INJURY |
|---|---|
| | |

| 45. To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated. Med ical Certifier (Name, Title, License No.) | 46. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. Med ical Examiner/Coroner (Name, Title, License No.) |
|---|---|
| | AV LORA ANN GARNSHAW M D |

| 45a. DATE SIGNED (Mo., Day, Year) | 45b. HOUR OF DEATH | 46a. DATE SIGNED (Mo., Day, Year) | 46b. HOUR OF DEATH |
|---|---|---|---|
| | | 12/24/2015 | 21:15 MILITARY |

| 47. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH |
|---|
| LORA ANN GARNSHAW 180 N MARIETTA PARKWAY MARIETTA GEORGIA 30060 |

| 48. REGISTRAR (Signature) | 49. DATE FILED - REGISTRAR (Mo., Day, Year) |
|---|---|
| AV DONNA L. MOORE | 02/04/2016 |

Form 3903.4 Rev. GEORGIA DEPARTMENT OF HUMAN RESOURCES                      DO NOT FOLD THIS CERTIFICATE

# MORGAN & MORGAN®

*Attorneys At Law*

SUITE 4200
191 PEACHTREE STREET NE
POST OFFICE BOX 57007
ATLANTA, GA 30343-1007
(404) 965-8811
FAX: (404) 965-8812

April 1, 2016

## PAGE 1 OF 5

Wellstar Medical Group Surgical Specialists at Cobb
Dr. Harry Lightfoot
**ATTN: MEDICAL RECORDS**     **PLAINTIFF'S EXHIBIT B**
1700 Hospital South Drive, Suite 202
Atlanta, Georgia 30106

Re:     Our Client:     Akiah Smith
        Date of Birth: 01/08/1990
        Date of Death: 12/26/2014
        S.S.N.:     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

To Whom It May Concern:

Our office has been retained to investigate a claim for injuries and damages arising out of an incident. **We request that you produce any and all records for the above named patient to include TASK LISTS not appearing in the progress notes, that include communication and disposition of all test results (ultrasounds, labs, radiology, etc.) and communications with the patient.**

Our office is in need of these medical records immediately, and we therefore request that you forward the records **within 5 to 7 days** of this letter. Enclosed is a form for certifying the medical records. **Please sign it, have it notarized, and attach it to the copies of the medical records.** We will reimburse you for all reasonable expenses associated with this request. A signed Authorization for Release of medical information is also enclosed for your files. We prefer the records in disc CD form, if possible, for records that are over 200 pages or more.

If you have any questions, or wish to discuss this matter more fully, please contact me. Thank you in advance for your cooperation and assistance.

Sincerely,

M. Shelli Stephens, RN
Legal Nurse Consultant

Enclosures

ATLANTA, GA ♦ BOWLING GREEN, KY ♦ COLUMBUS, GA ♦ DAYTONA BEACH, FL ♦ FT. MYERS, FL ♦ JACKSON, MS ♦ JACKSONVILLE, FL ♦ KISSIMMEE, FL ♦ LAKELAND, FL
LEXINGTON, KY ♦ LOUISVILLE, KY ♦ MANHATTAN, NY ♦ MELBOURNE, FL ♦ MEMPHIS, TN ♦ NAPLES, FL ♦ NASHVILLE, TN ♦ ORLANDO, FL ♦ PLANTATION, FL
ST. PETERSBURG, FL ♦ SARASOTA, FL ♦ SAVANNAH, GA ♦ TALLAHASSEE, FL ♦ TAMPA, FL ♦ TAVARES, FL ♦ THE VILLAGES, FL ♦ WINTER HAVEN, FL

-B-                 PAGE 2 OF 5

**AUTHORIZATION FOR RELEASE OF PROTECTED HEALTH INFORMATION (PHI) UNDER
HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)**

1.    The undersigned patient, named below, hereby executes this authorization in compliance with
the Federal Health Insurance Portability and Accountability Act, HIPAA, 45 CFR 164.104.

2.    This authorization is directed to the following healthcare provider (including its agents,
employees and associates):

Wellstar Medical Group Surgical Specialists at Cobb/Dr. Harry Lightfoot

Attn: Medical Records

Re: Akiah Smith

3.    The above-named healthcare provider is requested to release the protected health information
(PHI) that is described below, to the below law firm:

Morgan & Morgan Atlanta, PLLC
P. O. Box 57007
Atlanta, GA 30343-1007
Telephone: (404) 965-8825
Attn: _M. Shelli Stephens, RN, Legal Nurse Consultant_

4.    The protected health information released herein is specifically as follows:

All medical information of any nature whatsoever, from any source whatsoever, which is maintained by you in
your records, regarding the referenced patient and which is requested by my attorneys. If you are a physician or
out-patient clinic, you are authorized to send your entire chart upon their request, including, not only the records
dictated or written up by you, but also insurance records, handwritten notes, telephone memoranda, outside
records, correspondence, or any other tangible item maintained in my chart.

If you are a hospital, you are authorized to release my complete records including x-rays or similar studies,
office notes, face sheets, discharge summaries, history and physical, consultation notes, intra-operative records,
anesthesia records, operative reports, recovery room, pathology reports, medication administration records, EKG
reports, EKG strips, EEG reports, EEG strips, therapy notes, orders, progress notes, laboratory results, nurses
notes, vital sign sheets, intake/output records, reports of all x-rays, mammograms, CT scans, MRIs or PET
scans, emergency room records, transfer records, operative reports, anesthesia records, admitting summary,
discharge summary, discharge instructions, personal property list, in-patient records, out-patient records, clinic
records, correspondence, photographs, videotapes, telephone messages, computer generated information,
medical bills, pharmacy and drug records, health insurance forms, insurance claim forms, insurance payment
forms, Medicaid or Medicare records, concerning any medical treatment that I have received from you, at your
institution, or which you keep in the regular course of business. I hereby authorize release of all records,
regarding mental health, psychiatric, chemical dependency or HIV/AIDS. A photostatic copy of this
authorization shall be as valid as the original.

*Note: A copy of this Authorization shall be treated as an original*

**AUTHORIZATION FOR THE RELEASE OF PROTECTED HEALTH INFORMATION - page 2**

4. **PURPOSE OF DISCLOSURE**    -B

   ☐ My personal records   ☐ Attorney   ☐ Disability

   ☑ Other: _Family_

   **PAGE 3 OF 5**

5. **EXPIRATION OF AUTHORIZATION**

   Unless I request in writing otherwise, this authorization will expire on _____. If I do not specify an expiration date or

   _(insert date or event)_

   event, this authorization will expire ninety (90) days from the date on which it was signed.

6. **RIGHT TO REVOKE AUTHORIZATION**

   I understand that I have a right to revoke this authorization at any time. I understand that if I revoke this authorization, I must do so in writing and present written revocation to the Health Information Management Department(s) of the WellStar Health System facility or facilities checked above. I understand that the revocation will not apply to any health information that has already been released in response to this authorization.

7. **FEES**

   I understand that federal and state laws allow a fee to be charged for the copying of patient records and I will be responsible for the payment of such fees as follows:

   $0.97 per page from 1-20
   $0.83 per page from 21-100
   $0.66 for pages 101+
   Plus taxes

   **ROI Received**

   **JUL 0 7 2015**

8. **REFUSAL TO AUTHORIZE USE AND/OR DISCLOSURE**

   I understand that authorizing the use or disclosure of the information above is voluntary. I need not sign this form to ensure healthcare treatment. However, if I have been asked to sign this form in order to authorize the disclosure of my health information for purposes related to research, or for other reasons, I understand that WellStar Health System may decline to treat me if I refuse to sign this information only if: (1) the treatment would be related to a research project and this authorization is for the use or disclosure of my health information for such research, or (2) the treatment would be for the sole purpose of creating health information for disclosure to a third party (such as a pre-employment drug screen).

9. **RE-DISCLOSURE**

   I understand that if my health information is disclosed to a party other than a healthcare provider, health plan, or healthcare clearinghouse subject to the federal privacy regulations, my health information disclosed pursuant to this authorization may no longer be protected by the federal privacy regulations.

10. **RELEASE AND WAIVER**

    If the health information that I have requested WellStar Health System to disclose contains any privileged psychiatric or psychological information related to the treatment of physical and/or mental illness, chemical dependency or alcohol abuse, or testing or treatment of any communicable or infectious disease such as acquired immunodeficiency syndrome (AIDS), Immunodeficiency Syndrome Related Complex (ARC), human immunodeficiency virus (HIV), venereal disease, tuberculosis, or hepatitis, I hereby waive any privilege concerning such information for the purpose(s) of releasing it to the party or parties authorized above.

    I also release WellStar Health System, each of the WellStar Health System facilities checked above and their officers, trustees, agents, and employees from any and all liabilities, damages, and claims which might arise from the release of the health information authorized by me above.

    _Willie Paul Smith_
    Signature of Patient (or Patient's Legal Representative)

    _7/07/15_
    Date

    _____
    Description of Authority to Act for Patient

    **NOTE: A COPY OF THIS COMPLETED, SIGNED, AND DATED FORM MUST BE PROVIDED TO THE PATIENT AND/OR THE PATIENT'S REPRESENTATIVE, AND A COPY MUST BE PLACED IN THE PATIENT'S MEDICAL RECORD.**

-B-     PAGE 4 OF 5

The records include, but are not limited to, the following items:

| | | | |
|---|---|---|---|
| ____ Most Recent History and Physical | ____ All | From _____ to _____ | |
| ____ Most Recent Discharge Summary | ____ All | From _____ to _____ | |
| ____ Initial Patient Paperwork/Questionnaires | | ____ All | From _____ to |

| | | | |
|---|---|---|---|
| ____ Office Notes and Reports | ____ All | From _____ to _____ | |
| ____ Physical Therapy Records and Notes | ____ All | From _____ to _____ | |
| ____ Laboratory Reports and Results | ____ All | | |
| ____ X-ray and Imaging Reports | | ____ All | |
| ____ Consultation Reports from any other Physicians | ____ All | | |
| _X_ Entire Record and/or Chart | | | |
| ____ Final Narrative Reports & Impairment Ratings | | | |
| ____ Itemized Bill for Services Rendered | ____ Total Charges | _____ Balance | |

____ Medicare/Medicaid, ERISA, group health, medical, worker's compensation, etc., insurance and or collateral source benefits providers' records (i.e., medical records, medical reports, insurance and submission claim forms, payout records, benefits and policy information, subrogation language, claims of lien, etc.)

X Other All Task Lists that include communications with patient/ phone calls.

**REQUIRED DISCLOSURES - 45 CFR 164.508(c)**

A.      This protected health information is to be used for the following purpose:  A civil legal claim or proceeding.

B.      This authorization may be revoked by a signed and properly dated written revocation, delivered to the healthcare provider named above, provided that this release cannot be revoked as to protected health information that had been previously released in reliance on this document.

C.      The undersigned acknowledges that a refusal to sign this form will not result in a denial of healthcare by the hospital or any other healthcare provider and that this release has not been coerced by a healthcare entity or any of its business associates.

D.      The undersigned acknowledges that once the PHI is disclosed, it may be re-disclosed to individuals or organizations that are not subject to the federal privacy regulations such as expert witnesses, litigants, insurance companies, and even may become public record if filed with a court of law.

E.      This authorization will be effective for the entire duration of the legal matters related to the accident which involved the patient and occurred on _____ (month/day/year), unless earlier revoked in writing.

_____
Patient's Signature

Akiah Kamil Smith
Patient's Name

1/08/1990
Patient's Date of Birth

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
Patient's Social Security Number
(Form 47 – HIPAA)

_____
Signature of Authorized Representative (Parent,
Legal Guardian or Personal Representative)

_____
Witness

3/8/2016
Dated

*Note: a Copy of this Authorization Shall Be Treated as an Original*

-B-                              **PAGE 5 OF 5**

<u>**AFFIDAVIT OF RELATIONSHIP**</u>

RE: _Akiah Kamil Smith_
(PATIENT'S NAME, HEREINAFTER "PATIENT")

BEFORE ME, the undersigned authority, this day personally appeared

_Raquel Joyce_ hereinafter "Affiant", who after being dully sworn, deposes and says:

1.   The Affiant is the _Sister_ of Patient.
(relationship)

2.   Affiant is next of kin of Patient and is caring for Patient and acting on Patient's behalf as the responsible party.

3.   Affiant has maintained regular contact with Patient and is familiar with Patient's activities, health, religious beliefs, and moral beliefs.

4.   Affiant has exhibited special care and concern for Patient during Patient's elder years and nursing home admissions.

5.   Patient was injured <u>died</u> on the _26th_ day of _December_, _2014_ in _Cobb_ County, State of _Georgia_.

6.   Affiant stands next in line of intestate succession or under a will for the Patient and is responsible for the legal affairs of the Patient.

FURTHER AFFIANT SAYETH NOT.

_[Signature]_
Signature

Dated this _8_ day of _March_, _2016_.

STATE OF GEORGIA}
COUNTY OF _DeKalb_ }

The foregoing was sworn to and subscribed before me this _8th_ day of _March_, _2016_ by _Raquel Joyce_ who presented _____ as identification or is known by me and who did take an oath.

_[Signature]_
Notary (signature)
My commission expires:

(form #27–Georgia)

# MORGAN & MORGAN®

—— *Attorneys At Law* ——

SUITE 4200
191 PEACHTREE STREET NE
POST OFFICE BOX 57007
ATLANTA, GA 30343-1007
(404) 965-8811
FAX: (404) 965-8812

April 26, 2016

<u>Via Federal Express</u>

# PLAINTIFF'S EXHIBIT C    PAGE 1 OF 2

Raquel Joyce
3360 Slate Drive
Austell, GA 30106

RE:    Potential Medical Malpractice Claim of Akiah Smith
Date of Death: 12/26/2014

Dear Ms. Joyce:

Thank you for contacting Morgan & Morgan Atlanta, PLLC in regard to the potential medical malpractice claim arising out of the above death. **This follows your recent telephone conversation with my legal nurse consultant. This will confirm that Morgan & Morgan and its attorneys have decided <u>not</u> to pursue this case, and have decided <u>not</u> to undertake your representation.**

Please be advised that we have not and we will not seek review of your case by a medical doctor. Only a medical doctor can definitively state whether the care received fell below the accepted standard of care, and whether any such deviations caused injury. Since a medical doctor has not reviewed the medical records in this case, our decision not to handle your case is not a statement as to the merit of this potential medical malpractice case. In connection with our consideration of this case we obtained your medical records and reviewed them internally. Our decision to turn this potential case down for representation was based upon our review. As in all cases, I would urge you to speak with other attorneys regarding this potential case.

Under Georgia law, there are time limitations within which a lawsuit must be filed, or it will forever be barred. Generally, a lawsuit for wrongful death must be filed within two (2) years from the date of death. The statute of limitations for pain and suffering and bodily injury resulting from the negligence of a healthcare professional generally requires that suit be brought within two (2) years from the date of injury, although there is a limited tolling period between the date of death and the appointment of an administrator of the estate.

Please be aware that I have not attempted to outline your potential claims and all of the corresponding deadlines. What I set out above is simply a general guideline. You may have claims with different statutes of limitations than what I have addressed above, and under certain

—— www.forthepeople.com ——



circumstances, filing deadlines may be shortened or extended. Other shorter deadlines may apply such as a 6-month or 12-month notice requirement to municipalities, counties and state actors. We have taken no steps to provide notice of this potential claim to any municipalities, counties or state actors. Additionally, Georgia has a medical malpractice statute of repose which requires that suit be filed within five (5) years from the date when the negligent or wrongful act or omission occurred. Therefore, even if a case is filed within the statute of limitations, it may still be barred if it is filed outside the statute of repose. **Simply stated, you should not delay in consulting an attorney to undertake your representation in this potential case.**

Thank you for allowing the Firm and me the opportunity to consider this case of potential medical malpractice. **We will take no further steps to investigate this case, and with this letter we will close our file on this matter.** I am returning to you herein the material you provided us in connection with our review of this matter as well as those medical records we obtained in connection with our consideration of this potential case. Although we cannot handle this case for you, I hope that you will again consider Morgan & Morgan should you have need of a personal injury or workers compensation attorney in the future.

Sincerely,

Keenan R.S. Nix

KRSN/mss
Enclosures



**FORREST B. JOHNSON & ASSOCIATES**

LICENSED IN FL AND GA

July 25, 2016

# PLAINTIFF'S EXHIBIT D    PAGE 1 OF 2

*VIA CERTIFIED MAIL – 9402 7118 9956 3083 1997 81*

Ms. Raquel Joyce
3360 Slate Drive
Austell, Georgia 30106

       RE:    Death of Akiah Smith on December 26, 2014

Dear Ms. Joyce:

    We are in receipt of a package brought to us for review in June 2016. The package contained the following: (1) May 6, 2016 letter from Gary, Williams, Parenti, Watson & Gary, LLC declining representation, (2) a death certificate for Akiah Smith showing the date of death as December 26, 2014, (3) Cobb County Medical Examiner's Report, and (4) four-hundred (400) plus pages of medical records from Wellstar Health System and East Georgia Regional, Inc.

    Based upon the death certificate, we understand that Akiah Smith died as a result of acute peritonitis and dehiscence of surgical anastomosis (status post colectomy). You contacted our office and asked that we evaluate her medical treatment to determine whether there is any medical negligence/wrongful death action related to her care and treatment. This letter follows our review of Ms. Smith's medical records. It appears that Ms. Smith's death was ultimately caused by an infectious process. The records do not provide a complete picture of her clinical status at the time of her discharge. As such, there is an absence of information with regard to whether she exhibited any signs and symptoms of an infection at the time she was released. After review of the medical records, we have concluded that it would be difficult for you to sustain the burden of proof in a medical negligence/wrongful death action. Specifically, the records are void of information that would demonstrate medical negligence as the cause of wound dehiscence or acute peritonitis. If you have additional records related to her discharge let us know. At this time, however, we must decline representation for the reasons set forth above.

    Medical malpractice cases are complex, expensive to prepare and very time consuming with regard to preparation involved. When we accept a case, we have to be confident in the merits of the case. Pursuant to Georgia law, your case is subject to a **two-year statute of limitations,** meaning a lawsuit must be filed within two years of the date of the incident. If you strongly feel there has been malpractice and want to pursue further action, we recommend that you take your medical records and consult with another attorney as soon as possible. We hope we have been of some assistance to you and again thank you for allowing our firm the opportunity to consider your case.

## " A Commitment to Excellence "

1745 MLK JR. DR. N.W.  |  ATLANTA, GA 30314  |  TELEPHONE: 404/758/9111  |  TOLL FREE: 800/632/6026  |  FACSIMILE: 888/298/0458
201 SPRING STREET  |  MACON, GA 31201  |  TELEPHONE: 478/257/6266
FORRESTJOHNSON@FBJLAW.COM   WWW.FBJLAW.COM

Case 1:16-cv-04736-TCB   Document 1   Filed 12/23/16   Page 85 of 88

Page 2

**-D-**                    **PAGE 2 OF 2**

Should you have any questions or concerns, please do not hesitate to contact our office. We're enclosing the documents that you provided for our review.

Sincerely,
Forrest B. Johnson & Associates

Renee Y. Tucker

RYT/mc
Encl.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIE PEARL SMITH, )<br>individually and as Personal )<br>Representative for and administratrix )<br>of Akiah Kamil Smith's [Decedent] )<br>ESTATE, )<br>   **Plaintiff "*Pro Se*,"** )<br>Vs. )<br>Hospital Authority of Cobb County; )<br>Cobb Hospital, Inc; )<br>WELLSTAR COBB HOSITAL )<br>AUXILIARY, INC; )<br>WellStar Health System, Inc; )<br>Wellstar Medical Group, LLC; )<br>HARRY M. LIGHTFOOT, MD; )<br>PRITI PANDYA, MD; )<br>ROBERT J. DEL POZO, MD; )<br>UFUOMA Y. PHILEMON; )<br>PRASHANT PATIL V, MD; )<br>SITAL PATEL V, MD; )<br>RITESH L. PATEL, MD; )<br>RIFQUAT GIWA, MD; )<br>GAIL HARRIS, CM; )<br>JOAN M. CARNAHAN, ARRT; )<br>JEFFREY S. CHARPENTIER, MD; )<br>DOUGLAS L. CARR, LD; )<br>AASIM M. SHEIKH, MD; )<br>WALLACE SARA. LD; )<br>FRANK A. BUESE, MD; )<br>ERIC M. Knauer, MD; )<br>HealthPort Technologies, LLC; )<br>ELEANOR McLOVEEN; and )<br>DOES; ) | Civil Action No._____<br>**CERTIFICATE OF SERVICE**<br><br>1.LACK OF INFORMED CONSENT;<br>2.BREACH OF FIDUCIARY DUTY;<br>3.ARBITRARY ABUSE;<br>4.FRAUDULENT CONCEALMENT;<br>5.CONSTRUCTIVE FRAUD;<br>6.BREACH OF PROMISSORY<br>  ESTOPPEL<br>7.BREACH OF IMPLIED CONTRACT<br>8.CONVERSION<br>9.FRAUD-FALSIFIED;<br>10.WILLFUL MISCONDUCT;<br>11.INTENTIONAL TORT OF<br>  WRONGFUL SURGERY<br>12.NEGLIGENCE;<br>13.MEDICAL BATTERY;<br>14.MEDICAL MALPRACTICE;<br>15.WRONGFUL DEATH;<br>16.PAIN AND SUFFERING. |

-1-

**ET. AL.,**          )
    **Defendants.**      )
_____ )

This will serve as a formal certificate that the foregoing Defendants have been

served a copy of the Plaintiff's December 23, 2016 Complaint w/Exhibit A-D,

attached, for Actionable Damages through provisions of Local Rule of this Court

authorizing service of complaint along with a Notice of Lawsuit and Request To

Waive Service of A Summons and a Waiver of The Service of Summons, via U.S.

Postal 1st Class postage with sufficient prepaid means to ensure return of a signed

copy from registered agent of Defendants, at the following address:

Scott A. Cochran,

Agent for Hospital Auth.of Cobb County

   2950 Atlanta, Rd, S.E.

Smyrna, Georgia 30080

Ph. (770) 435-2131

Brian P. Kemp

Administrator for Cobb County Hospital, Inc

   214 State Capitol

Atlanta, Georgia 30334

Leo E. Reichert,

Agent for Wellstar Defendants et al.,

793 Sawyer Road

Cobb/Marietta, Georgia 30062

Corporation Service Company

Agent for Healthport Technologies, LLC

40 Technology Parkway South, Suite 300

Gwinnett, Norcross, Georgia 30092

Dated: <u>December 23, 2016</u>

/s/ *Willie Pearl Smith*

Willie Pearl Smith, "Pro Se"

Plaintiff,

107 Eason Street

Statesboro, Georgia 30458

Ph. 912.259.2436

*3.*